# EXHIBIT A



**KENTUCKY**
*COURT OF JUSTICE*
19-CI-00103

## UBOH, CORNELIUS VS. UNITED STATES EQUESTRIAN FEDERATION, ET

**FAYETTE CIRCUIT COURT**

Filed on **01/11/2019** as **PERSONAL INJURY** with **HON. LUCY A. VANMETER**

**\*\*\*\* NOT AN OFFICIAL COURT RECORD \*\*\*\***

---

**Parties** 19-CI-00103

**ALLEN, KENT** as **DEFENDANT / RESPONDENT**

| Address |
| --- |
| 4047 IRON WORKS PARKWAY |
| LEXINGTON KY 40511 |

| Summons |
| --- |
| CIVIL SUMMONS issued on **01/11/2019** by way of **RETURNED TO ATTORNEY/PETITIONER** |

**KEATING, SONJA** as **DEFENDANT / RESPONDENT**

| Address |
| --- |
| 4047 IRON WORKS PARKWAY |
| LEXINGTON KY 40511 |

| Summons |
| --- |
| CIVIL SUMMONS issued on **01/11/2019** by way of **RETURNED TO ATTORNEY/PETITIONER** |

**KESSLER, MURRAY** as **DEFENDANT / RESPONDENT**

| Address |
| --- |
| 4047 IRON WORKS PARKWAY |
| LEXINGTON KY 40511 |

| Summons |
| --- |
| CIVIL SUMMONS issued on **01/11/2019** by way of **RETURNED TO ATTORNEY/PETITIONER** |

**MORONEY, WILLIAM** as **DEFENDANT / RESPONDENT**

| Address |
| --- |
| 4047 IRONWORKS PARKWAY |
| LEXINGTON KY 40511 |

| Summons |
| --- |
| CIVIL SUMMONS issued on **01/11/2019** by way of **RETURNED TO ATTORNEY/PETITIONER** |

**UBOH, CORNELIUS** as **PLAINTIFF / PETITIONER**

**UNITED STATES EQUESTRIAN FEDERATION** as **DEFENDANT / RESPONDENT**

| Memo |
| --- |
| Registered Agent of Service exists. |

| Address |
| --- |
| 4047 IRON WORKS PARKWAY |
| LEXINGTON KY 40511 |

| Summons |
| --- |
| CIVIL SUMMONS issued on **01/11/2019** served on **01/25/2019** by way of **CERTIFIED MAIL** |
| CIVIL SUMMONS issued on **01/11/2019** by way of **RETURNED TO ATTORNEY/PETITIONER** |

**ABARAY, JOHN** as **ATTORNEY FOR PLAINTIFF**

| Address |
| --- |
| 9418 NORTON COMMONS BLVD, SUITE 200 |
| LOUISVILLE KY 40059 |

**KEATING, SONJA** as **REGISTERED AGENT OF SERVICE**

| Memo |
| --- |
| Related party is UNITED STATES EQUESTRIAN FEDERATION |

**Address**

UNITED STATES EQUESTRIAN FEDERATION

4047 IRON WORKS PARKWAY

LEXINGTON KY 40511

---

| Documents | 19-CI-00103 |
|---|---|

**COMPLAINT / PETITION** filed on **01/11/2019**

**EXHIBIT** filed on **01/11/2019**

**EXHIBIT** filed on **01/11/2019**

**EXHIBIT** filed on **01/11/2019**

**EXHIBIT** filed on **01/11/2019**

**EXHIBIT** filed on **01/11/2019**

**EXHIBIT** filed on **01/11/2019**

**RECEIPT** filed on **01/11/2019**

---

| Images | 19-CI-00103 |
|---|---|

**COMPLAINT / PETITION** filed on **01/11/2019**   *Page(s): 26*

**EXHIBIT** filed on **01/11/2019**   *Page(s): 1*

**EXHIBIT** filed on **01/11/2019**   *Page(s): 7*

**EXHIBIT** filed on **01/11/2019**   *Page(s): 6*

**EXHIBIT** filed on **01/11/2019**   *Page(s): 1*

**EXHIBIT** filed on **01/11/2019**   *Page(s): 2*

**EXHIBIT** filed on **01/11/2019**   *Page(s): 1*

**SUMMONS** filed on **01/11/2019**   *Page(s): 1*

**SUMMONS** filed on **01/11/2019**   *Page(s): 1*

**SUMMONS** filed on **01/11/2019**   *Page(s): 1*

**SUMMONS** filed on **01/11/2019**   *Page(s): 1*

**SUMMONS** filed on **01/11/2019**   *Page(s): 1*

**SUMMONS** filed on **01/11/2019**   *Page(s): 1*

**COURTESY FINANCIAL TRANSACTION REPORT** filed on **01/11/2019**   *Page(s): 1*

**\*\*\*\* End of Case Number : 19-CI-00103 \*\*\*\***



| AOC-E-105 Sum Code: CI<br>Rev. 9-14<br><br>Commonwealth of Kentucky<br>Court of Justice    *Courts.ky.gov*<br><br>CR 4.02; Cr Official Form 1 | **CIVIL SUMMONS** | NOT ORIGINAL DOCUMENT<br>01/17/2019 02:47:45 PM<br>Case #: **19-CI-00103**<br>abaravie<br>Court:    **CIRCUIT**<br>County: **FAYETTE** |

*Plaintiff,* **UBOH, CORNELIUS VS. UNITED STATES EQUESTRIAN FEDERATION, ET,** *Defendant*

TO:  **UNITED STATES EQUESTRIAN FEDERATION**

     **4047 IRON WORKS PARKWAY**

     ~~LEXINGTON, KY 40511~~

Memo:  Registered Agent of Service exists.

The Commonwealth of Kentucky to Defendant:

    You are hereby notified that a **legal action has been filed against you** in this Court demanding relief as shown on the document delivered to you with this Summons. **Unless a written defense is made by you or by an attorney on your behalf within twenty (20) days** following the day this paper is delivered to you, judgment by default may be taken against you for the relief demanded in the attached complaint.

The name(s) and address(es) of the party or parties demanding relief against you or his/her (their) attorney(s) are shown on the document delivered to you with this Summons.

*Vincent Riggs*

Fayette Circuit Clerk
Date: **1/11/2019**

---

## Proof of Service

This Summons was:

☐ Served by delivering a true copy and the Complaint (or other initiating document)

    To: _____

☐ Not Served because: _____

Date: _____, 20_____

                                   Served By

                                   Title

Summons ID: @00000837250
CIRCUIT: 19-CI-00103 Certified Mail
UBOH, CORNELIUS VS. UNITED STATES EQUESTRIAN FEDERATION, ET



Page 1 of 1



COMMONWEALTH OF KENTUCKY
FAYETTE CIRCUIT COURT
DIVISION _____
CASE NO. _____

*Electronically Filed*

DR. CORNELIUS UBOH                                                          PLAINTIFF

v.

UNITED STATES EQUESTRIAN FEDERATION                                        DEFENDANTS

> Serve:
> Sonja Keating,
> United States Equestrian Federation,
> 4047 Iron Works Parkway,
> Lexington, KY 40511

WILLIAM MORONEY

> Serve:
> William Moroney
> United States Equestrian Federation,
> 4047 Iron Works Parkway,
> Lexington, KY 40511

MURRAY KESSLER

> Serve:
> Murray Kessler
> United States Equestrian Federation,
> 4047 Iron Works Parkway,
> Lexington, KY 40511

SONJA KEATING

> Serve:
> Sonja Keating
> United States Equestrian Federation,
> 4047 Iron Works Parkway,
> Lexington, KY 40511

and

KENT ALLEN

    Serve:
    Kent Allen
    United States Equestrian Federation,
    4047 Iron Works Parkway,
    Lexington, KY 40511

## **COMPLAINT**

Comes the Plaintiff, Dr. Cornelius Uboh, by and through counsel, for his claims and caused of action against the Defendants, the United State Equestrian Foundation, William Moroney, Murray Kessler, Sonja Keating, and Kent Allen, herein states as follows:

### **PARTIES**

1.    Plaintiff, Cornelius E. Uboh, PhD., is a former employee of defendant, UNITED STATES EQUESTRIAN FEDERATION ("USEF" or "Defendant").   He resides at 130 Conway Court, Exton, PA 19341.

2.    Defendant, USEF is a federation of equine sports located at 4047 Iron Works Parkway, Lexington, KY 40511. It is the lead institution in the United States for the equine sports equine sports industry, including its operation of an equine drug-testing laboratory for the analysis of post competition samples to protect horses from drug abuse and prevent horse owners from cheating.

3.    Defendant, William Moroney, is the Chief Executive Officer of Defendant, USEF, which is located at 4047 Iron Works Parkway, Lexington, KY 40511.

4    Defendant, Murray Kessler, is the President of Defendant, USEF, which is located at 4047 Iron Works Parkway, Lexington, KY 40511.

Filed          19-CI-00103     01/11/2019          Vincent Riggs, Fayette Circuit Clerk NOT ORIGINAL DOCUMENT
                                                                                          01/17/2019 02:51:25 PM
                                                                                          abarayje

5.    Defendant, Sonja Keating, is the Executive Vice President and General Counsel of

Defendant, USEF, which is located at 4047 Iron Works Parkway, Lexington, KY 40511.

6.    Defendant, Kent Allen VMD, is Chair of the Veterinary Committee of Defendant

USEF, which is located at 4047 Iron Works Parkway, Lexington, KY 40511.

7.    Defendant USEF employed Uboh, as its Laboratory Director, its first laboratory

director who is an African American, naturalized United States citizen. Dr. Uboh was born in

Nigeria, and was the first and only black person of foreign birth to hold the position of USEF

Laboratory Director. .   In announcing Dr. Uboh's appointment, USEF stated on its website:

### USEF Appoints Dr. Cornelius Uboh as Laboratory Director

*by USEF Communications Department | Sep 19, 2016, 2:30 PM EST*

Prior to accepting the position with the USEF, Uboh served for 27 years as the Bureau
Director of the Pennsylvania Equine Toxicology and Research Laboratory in West Chester,
PA. He was also an Adjunct Associate Professor of Pharmacology and Pharmacy in the
Department of Clinical Studies at the University of Pennsylvania's School of Veterinary
Medicine at the New Bolton Center campus. Uboh has authored and co-authored over 100
publications and has presented papers at numerous national and international conferences.
Notably, Uboh, along with Dr. Lawrence R. Soma, VMD, led the efforts to develop and
establish the world's first-ever method for confirming blood-doping agents in racehorse
serum, commonly known as EPO.

*See* USEF website announce of Dr. Uboh's appointment which is attached hereto as Exhibit "A".

8.    USEF and Dr. Uboh entered an Employment Agreement dated September 19, 2016

("Employment Agreement"), which is attached hereto as Exhibit "B." The Employment

Agreement, which was negotiated by Sonja Keating, Vice President and General Counsel of

USEF, and Dr. Uboh's counsel, provided that Dr. Uboh would receive a base salary of $200,000.00

and be eligible to receive "merit increases in pay at the discretion of the USEF Chief Executive

Officer." Exhibit "B" at ¶3.1.

## JURISDICTION AND VENUE

9.     This Court has jurisdiction of Plaintiff's claims because the events leading up to this action all arose in Fayette County, Kentucky.

10.     Venue is proper in this Court because the unlawful practices, with the exception of those claims arising under the Wage Payment and Collection Law, 43 Pa C. S. §260.1 (WPCL), alleged herein, occurred within the jurisdiction of this Court.

## SUMMARY OF FACTS

11.     (A)     On January 31, 2018, Dr. Uboh received a Confidential Severance Agreement and General Release ("Severance and Release Agreement"). It stated that his employment with USEF was terminated effective January 31, 2018, (Effective Date).  *See* Severance and Release Agreement attached hereto as Exhibit "C."

(B)     The offered Severance and Release Agreement states that Dr. Uboh would receive severance in the amount equivalent to three (3) months pay, subject to normal payroll practices and state and federal tax withholding practices, plus three (3) months payment of COBRA benefits, subject to Dr. Uboh's repayment of $14,999.85 in moving expenses benefits. In addition, the Agreement stated that USEF would not challenge any application by Dr. Uboh for unemployment compensation.

(C)     The Severance and Release Agreement provided further that Dr. Uboh would cooperate and, provide assistance in the form of preparation and testimony at pending USEF Hearing Committee matters, at the rate of $175.00 per hour plus payment for reasonable expenses.

12.    (A)    The primary reason given to Dr. Uboh for his termination was the

displeasure of the USEF membership with the settlement reached in the so-called "GABA" matter,

following a hearing regarding alleged drug abuse by a jockey (Ms. Farmer) and USEF member

and trainer/owner, David "Larry" Glefke.

(B)    In connection with that matter, however, Ms. Keating sent an

email to Dr. Uboh thanking him for his testimony at the hearing stating: "We won because of you."

Dr. Uboh was so pleased; he shared Ms. Keating's statement with his employees in the USEF

laboratory thanking them for their work. Dr. Uboh also received accolades from William Moroney,

USEF Chief Executive Officer, Alan Foreman, Esq., USEF counsel at the hearing, and Dr. Stephen

Schumacher, USEF Laboratory Program Director, for the excellence of his expert testimony in the

matter before the hearing committee.

(C)    This was a termination "Without Cause by USEF."

13.    (A)    Dr. Uboh was a contractual employee of USEF. With respect to

compensation and the circumstances of the termination of employment, Dr. Uboh's Employment

Agreement (Exhibit "B") provides in relevant part:

> WHEREAS, USEF desires to employ Uboh as its Laboratory Director; and
>
> WHEREAS, Uboh desires to accept such employment in accordance with the terms and conditions set forth herein.
>
> NOW, THEREFORE, in consideration of the mutual promises and of the covenants contained in this Agreement, USEF and Uboh agree as follows:
>
> 1. Term of Employment. The term of this Agreement shall commence on September 19, 2016 and continue for an initial period of five years, until September 19, 2021 unless terminated in accordance with the terms and conditions set forth in Section 4 of this Agreement ("Term").

2. ...

3. Compensation, Benefits, and Expenses.

3.1. Base Salary. Except as otherwise provided in this Agreement, effective upon September 19, 2016, USEF shall pay Uboh an annual salary of $200,000.00 ("Base Salary"), in equal bi-weekly payments less appropriate deductions for taxes and other amounts as agreed or as required by law to be withheld. Uboh will be eligible for merit increases in pay at the discretion of the USEF Chief Executive Officer. Merit increases are typically decided on an annual basis following performance reviews. [3] Uboh will receive no fewer than one annual review. [4] ...

4. Termination. This Agreement may be terminated on the occurrence of any of the events or in the circumstances set forth in Subsections 4.1 - 4.4, below.

4.1 ...

4.2 For Cause. USEF may, at its sole discretion, terminate UBOH's employment for cause. For purposes of this Agreement, "Cause" means: (i) continuing material neglect by UBOH of or refusal by Uboh to perform his duties which, if curable, is not cured within thirty (30) days following written notice thereof from USEF; (ii) breach of a fiduciary duty or duty of loyalty to USEF, which, if curable, is not cured within thirty (30) days following written notice thereof from USEF; (iii) fraud, embezzlement or other dishonest act or the commission of any act relating to the to any felony crime involving moral turpitude, or crime against business or affairs of USEF involving moral turpitude by Uboh toward USEF; (iv) a material breach of or substantial failure to perform any obligation of Uboh under this Agreement, if such breach or failure, if curable, is not cured within thirty (30) days after written notice is provided to Uboh; (v) any act of slander or libel by Uboh against USEF or any of its members, directors, employees or consultants; (vi) the conviction of or a plea of nolo contendere USEF or its affiliates or any crime that constitutes a violation of the Safe Sport Policies; (vii) use of alcohol during work hours in a manner that materially impairs Uboh's ability to fully and effectively perform his job duties, or the use of illegal drugs or controlled substances (excluding substances prescribed by a health care professional and taken in accordance with such prescription) at any time. In the event that Uboh's employment pursuant to this Agreement is terminated for Cause, Uboh will receive no salary or other benefits pursuant to this Agreement other than accrued but unpaid Base Salary and accrued benefits through the date of termination.

4.3 Without Cause by USEF. In the event USEF terminates this Agreement and Uboh's employment without Cause, Uboh will receive all accrued but unpaid salary and other benefits to the date of termination. In addition, provided Uboh (i) agrees to a written instrument satisfactory to USEF, in its sole discretion, to release USEF, its officers, directors, employees, agents and related entities, from any and all claims arising out of or related to Uboh's employment or termination of

NOT ORIGINAL DOCUMENT
01/17/2019 02:51:25 PM
abarayje

employment, (ii) acknowledges that the receipt of severance under this Agreement is subject to the terms and conditions of the written release, and (iii) continues to abide by post-employment obligations including, but not limited to, the obligations set forth in Sections 5, 6, 7, 8, and 9 of this Agreement, Uboh will receive severance pay in an amount equal to 12 months of Base Salary plus Fringe Benefits (at the rate in effect as of the termination date). Such severance pay will be paid as salary continuation, in equal monthly installments, commencing within forty-five (45) days following Uboh's termination, provided he has then executed a separation agreement and release satisfactory to USEF in its reasonable discretion. If Uboh dies before all severance payments have been made, USEF will continue to make the payments to Uboh's beneficiary on the same schedule as the payments would have been made to Uboh had he lived. With the exception of any benefits provided pursuant to Section 3.3 of this Agreement, all other benefits and perquisites of employment provided under this Agreement will cease upon UBOH's termination of employment.

(Exhibit "B").

(B)      After receiving verbal notice of his termination, Dr. Uboh

advised USEF Chief Executive Officer (CEO), Mr. Moroney, of his unwillingness to sign the

release until he reviewed it with his attorney.

(C)      Thereafter, Dr. Uboh advised Ms. Keating by letter dated

February 16, 2018, through his attorney, of his unwillingness to sign the proposed Severance

Agreement and Release because it did not provide the amount of severance pay specified for a

termination "without cause" under Section 4.3 of his Employment Agreement. (Exhibit "B".)

## BACKGROUND

14.    (A)      Dr. Uboh began working at the USEF on or about September 19, 2016.

(B)      In August 2016, prior to Dr. Uboh's hiring, the USEF laboratory conducted

testing and analysis of blood samples in the Glefke/Farmer case.  The USEF lab tested and

analyzed three blood samples in the case, two blood samples marked "A" and one sample marked

"B" (#C07000). The tests confirmed positive results for the presence of gamma aminobutyric acid (GABA), a proscribed substance, in both "A" samples.   Upon information and belief, the USEF was aware of these positive test results and informed the trainer/owner, David "Larry" Glefke, of them.

15.      (A)      In the Glefke/Farmer case, as in all cases, the veterinarian in-charge of post competition samples collects 3 blood tubes from each horse/winner.  All three tubes are then labeled with the horse's assigned number for the competition, the date of the competition, and the name of the competition.  All the samples collected are retained and stored under the custody of the veterinarian until the veterinarian delivers them to the laboratory either by a contracted courier or via hand-delivery.

(B)      Based upon laboratory records reviewed by Dr. Uboh, veterinarian Dr. Connie Brown was responsible for collecting and delivering the blood samples in the Glefke/Farmer case. She collected the blood samples on July 28, 2016, and hand-delivered them to the USEF laboratory on August 01, 2016.  The records confirm that the Glefke/Farmer samples were received by the laboratory on August 1, 2016, and identify the Event in which the horse (C07000) competed, after which they were taken, as the "Kentucky Summer".

(C)      Two blood tubes of the "A" sample were analyzed by the USEF laboratory and one blood tube "B" sample was stored for use in possible confirmation testing, frozen at -70 to 80 degrees Fahrenheit, in the event the trainer chose to challenge the test results of the primary laboratory on the "A" sample.  Such a challenge is typically accomplished by requesting, in accordance with worldwide industry standards, an independent laboratory to perform analysis on the "B" sample.

(D)     Defendants did not follow the worldwide standard instead analyzing the "B" itself.

16.     (A)     Sometime in March 2017, after being presented with the positive GABA test findings from Sample "A", Mr. Glefke and/or Ms. Kelley Farmer formally objected to the positive GABA findings and requested that the USEF laboratory test and analyze the "B" blood samples at issue.

(B)     At that time, Dr. Uboh made clear to USEF his concerns about and objections to this unconventional practice, explaining that in such instances the regulating body should insist that the requesting parties  retain an independent laboratory to perform such testing, in accordance with accepted international standards.

(C)     Instead of requiring trainer Glefke to select an independent laboratory to which the "B" sample would be sent for testing and analysis when he challenged the test results, USEF agreed – over Dr. Uboh's strenuous objections - to the unconventional practice of testing the "B" sample in its own laboratory - the same laboratory that tested the "A" sample.

17.     (A)     By agreeing to analyze the "B" sample in the Glefke/Farmer case after having conducted the challenged test results for the "A" sample, the USEF laboratory disregarded national and international drug testing regulations and protocol including those of the International Olympics Committee and World Anti-Doping Agency (WADA).

(B)     During his employment with USEF, Dr. Uboh worked hard to improve USEF's laboratory standards.  Dr. Uboh informed USEF that under WADA protocol the laboratory which analyzed the corresponding "A" sample should NOT even store the

corresponding "B" sample in its facilities, let alone conduct testing and analysis of it. The "B"

sample is intended to protect the right of the accused, by allowing he or she to send the "B" sample

to a selected outside laboratory for independent analyses.

18.    Dr. Uboh was not responsible for the matters in dispute in the Glefke/Farmer case

because the samples were collected before he was hired, and USEF ignored his objections and

violated WADA protocols by agreeing to Mr. Glefke and/or Ms. Farmer's request that the USEF

conduct analysis of some samples collected based on the request of the trainer/owner as was done

in the Glefke/Farmer case.

19.    These infractions by USEF enabled the "B" sample test result which caused

irreparable harm to USEF's drug testing program.

20.    (A)    When Dr. Uboh was notified of the USEF's directive for the laboratory to

analyze the "B" sample in question, he chose the laboratory's most qualified chemist, Paul

Mulherin, to perform the extraction of GABA from the "B" sample for testing.

(B)    He also chose a second highly qualified Chemist, Michael

Lomangino, to perform the LC-MS/MS analysis. No other chemist in the laboratory had done more

work on sample extractions to recover GABA from blood/plasma sample for analysis than Paul

Mulherin, and no other chemist in the laboratory had analyzed extracted blood/plasma samples for

GABA using liquid chromatography tandem mass spectrometry (LC-MS/MS), the universally

accepted method of analysis and quantification, than Michael Lomangino.

(C)    Thus, in both instances, Dr. Uboh chose the most qualified USEF chemists

for the job.

21.    (A)    USEF's Quality Assurance Officer (QAO), Jason Mullins, subsequently

informed Dr. Uboh that the blood separator was breached when Mr. Mulherin briefly vortexed

(*i.e.,* rotary mixed) the test tube containing the sample, before the sample extraction using LC-

MS/MS to recover GABA for analysis was made.   By the time Dr. Uboh learned of the breached

silicone separator, Mr. Lomangino had already submitted the extracted sample to the LC-MS/MS

workstation for analysis and all entries into the instrument had been made.

(B)    Under the circumstances, Dr. Uboh decided to wait for the

result obtained by the LC-MS/MS workstation analysis before determining if the "breach" had any

adverse effect on the test result.

22.    In his capacity as Laboratory Director, it was Dr. Uboh's responsibility to report

only a verifiable and scientifically defensible result to the USEF.

23.    (A)    The completed LC-MS/MS analysis showed that the concentration of

GABA in the "B" sample was nearly 6 times higher than that of the "A" sample analyzed in August

of 2016.   There was a question as to whether the breach of the silicone separator caused this

unexpected result.

(B)    Dr. Uboh concluded that the best way to determine if the vortex of the

sample and the resulting silicone separator breach implicated the GABA levels found in the test

results was to conduct a subsequent test replicating those circumstances.

24.    (A)    Dr. Uboh conducted this testing using prior GABA positive samples

provided by QA Officer Mullin.   The USEF retained these past GABA positive samples for

NOT ORIGINAL DOCUMENT
01/17/2019 02:51:25 PM
abarayje

research purposes where the cases in question had been settled, or to be used as positive controls in place of drug (GABA) administration samples when necessary.

(B)    Thereafter, at Dr. Uboh's request, the separator in one of the previous GABA positive "B" samples was similarly breached by vortexing to allow red blood cells into the plasma portion of the sample, as was the case in the "B" sample for the GABA case at issue here.

25.    (A)    Dr. Uboh then had all 3 samples similarly extracted by Chemist Mulherin and submitted to the same LC-MS/MS workstation for analysis by Chemist Lomangino for consistency.

(B)    These replicated analyses were performed, systematically and correctly, consistent with the protocol of an accredited laboratory. The results obtained showed no significant difference between the results previously obtained three or fours years ago and those from the same three previous GABA positive samples re-analyzed in March of 2017.

26.    (A)    In Dr. Uboh's reasonable scientific opinion, this demonstrated that the breach of the silicone separator was not a contributing factor in the "unexpectedly" high result of the concentration of GABA in the "B" sample of Glefke/Farmer. Dr. Uboh's findings were consistent with those of Dr. George A. Maylin, Consultant for USEF on Pharmacology of drugs in horses, whose research has not identified any published scientific evidence to USEF that the presence of silicone separator alters the concentration of any drug in blood/plasma testing samples.

(B)    Accordingly, the result obtained from the initial LC-MS/MS

Filed          19-CI-00103     01/11/2019          Vincent Riggs, Fayette Circuit Clerk   NOT ORIGINAL DOCUMENT
01/17/2019 02:51:25 PM
abarayje

analysis of the "B" sample was reported to the USEF via the Program Director, Stephen
Schumacher, VMD.

27.     (A)     Dr. Uboh did not report the data from the experiments he directed to
determine whether any effect of a breached separator to the Federation with the GABA "B"
sample, because the results were not part of the GABA "B" sample analysis requested by the
Program Director/USEF and the breached separator did not contribute to the GABA result in the
"B" sample.

        (B)     However, all the data for the results obtained were saved in the
USEF instrument computer and available for review at any time.  In fact, Dr. Uboh provided the
results to Ms. Keating immediately following her request for them.

28.     Dr. Uboh testified in front of the Hearing Committee of USEF on June 6th, 2017

29.     (A)     Dr. Uboh did not shield any information from the Federation.  Rather, he
did not provide data from the "brief experiment" conducted to determine the effect, if any, of a
silicone breach upon the GABA test results.  That data was known by and readily available to
USEF officials prior to the Hearing and Dr. Uboh's testimony.

        (B)     Subsequently the fiction was created that Dr. Uboh withheld these test
results and the underlying breach of the silicone separator from the USEF. This is simply not the
case.

Filed          19-CI-00103     01/11/2019          Vincent Riggs, Fayette Circuit Clerk

Filed          19-CI-00103      01/11/2019          Vincent Riggs, Fayette Circuit Clerk     NOT ORIGINAL DOCUMENT
01/17/2019 02:51:25 PM
abarayje

30.    (A)    To the contrary, the USEF and its counsel were fully aware of the silicone separator breach from the date of the "B" sample testing requested by Glefke and Farmer from the time that it occurred.

(B)    On the testing date in March 2017, USEF legal counsel Sonja Keating sent a representative of her office, Amelia Sandos, Esquire, to the USEF lab to observe:

(1) the removal of the sample from the freezer;

(2) documentation of the sample identification number (many photographs were taken for documentation, which are available for inspection at any time); and

(3) the extraction procedures. Ms. Sandos was present for and directly observed the breach of the silicone separator, which occurred during testing.

(C)    No negative report on handling of the sample by the laboratory was filed by Ms. Keating, Ms. Sandos, or any other person from the legal office of the Federation.

(D)    Furthermore, the USEF Laboratory's QA Officer, Jason Mullin, was aware of the results of the "B" sample and the previous "A" and "B" samples in the experiment.   Had Dr. Uboh done anything improper in his handling of the results or the analysis, QA Officer Mullin would have reported the impropriety to the USEF.  QA Officer Mullin made no such report.

31.    (A)    Despite knowledge that the breach occurred, USEF and its counsel chose to proceed with arbitration of the case against Glefke and Farmer without disclosing it to the tribunal or to opposing counsel.

(B)    If USEF believed that the breach of the silicone separator

was a problem, either the USEF chose not to disclose the breach to its counsel or counsel knowingly chose to proceed in the case without disclosing that the breach occurred to the tribunal.

(C)    Regardless of how it happened, this failure/omission was knowing and in no way attributable to Dr. Uboh.

32.    (A)    Even after the breach was disclosed; the USEF continued to prosecute the case against Glefke and Farmer.

(B)    USEF had the option to drop the case at that point if it believed that the breach implicated the test results in any way but chose not to do so.

(C)    To cover its and its counsel's failure to disclose the breach in the first instance, the USEF falsely accused Dr. Uboh of concealing the test information and made him a fall guy.

(D)    The USEF's actions, in turn, defamed Dr. Uboh and effectively destroyed his professional reputation.

33.    Dr. Uboh took his responsibilities at the USEF Laboratory very seriously and performed each function to an impeccable standard. Before the Glefke/Farmer case, USEF management lauded Dr. Uboh's actions in staff hiring and modernizing the laboratory's equipment and procedures.

34.    Dr. Uboh's credibility and professional reputation were destroyed by the revisionist history perpetrated by the USEF and its counsel to account for their decision to prosecute Glefke and Farmer without disclosing the testing breach to USEF hearing counsel and/or the tribunal.

35.     Upon information and belief, USEF took these actions against Dr. Uboh to please its membership, which, upon information and belief, has long been upset and disturbed by the USEF's inability to remove a perceived "cheater", David "Larry" Glefke, from the sport.

36.     (A)     USEF and its counsel were fully aware of the breach that occurred during the "B" sample testing, through the presence and observation of USEF Attorney, Amelia Sandos, Esquire, and USEF QA Officer Mullin, notwithstanding the fact that the breach did not have any implication on the "B" sample test results.

        (B)     However, USEF and its counsel chose not to disclose the breach to opposing counsel or the tribunal in the course of its prosecution of the GABA case.

        (C)     The USEF and its counsel needed someone to blame once the information in their possession concerning the breach became known to opposing counsel.

        (D)     Faced with these circumstances, USEF chose to drop charges against and the suspensions of Glefke and Farmer.

        (E)     As a newly hired, minority Laboratory Director, Dr. Uboh became a convenient scapegoat for USEF's decision to take these actions.

37.     The USEF's proposal of three months' severance is unacceptable to Dr. Uboh and violates the terms of his Employment Agreement.  The USEF has terminated his employment on false grounds and destroyed his professional reputation in the national and international equine community in the process.

## COUNT ONE
## BREACH OF CONTRACT

38.     Plaintiff reasserts paragraphs 1 through 37 as if stated in full and incorporates those paragraphs herein.

39.     Plaintiff's employment was terminated by USEF for a "not for cause" reason as defined in his Employment Agreement, Exhibit "B".   Accordingly, under the terms of his Employment Agreement, Dr. Uboh is entitled to one year of severance pay following a "not for cause" termination.

40.     Instead, as set forth above, USEF has falsely alleged that Dr. Uboh's termination was "for cause," destroying his professional reputation in so doing.   USEF has offered Dr. Uboh three months of severance pay in material breach of his Employment Agreement.

41.     Plaintiff is entitled for damages as provided under his Employment Agreement. *Id.*

## COUNT TWO
## WAGE PAYMENT AND COLLCTION LAW

42.     Plaintiff reasserts paragraphs 1 through 41 as if stated in full and incorporates these paragraphs herein.

43.     Plaintiff's wages and reimbursement of expenses were paid by USEF by direct deposit into his Pennsylvania bank account,under his home address in Pennsylvania.

44.     Pennsylvania law provides for the collection of unpaid wages through the KRS §337.385. Employer's liability — Unpaid wages and liquidated damages — Punitive damages for forced labor or services. (§337.385).

45.     Plaintiff was not compensated for his scheduled annual salary increase that is due in December/January of 2017/2018.

46.     Additionally, Dr. Uboh was not reimbursed for the business expenses he incurred.

## COUNT THREE
## DEFAMATION *PER SE*

47.     Plaintiff reasserts paragraphs 1 through 46 as if stated in full and incorporates these paragraphs herein.

48.     USEF knowingly and falsely accused Plaintiff of manipulating and/or concealing test data and testifying falsely at the USEF testing hearing for the Glefke/Farmer case. Dr. Uboh was not responsible for the initial testing or the error, which occurred in retesting of the Glefke/Farmer sample. Moreover, USEFs' in-house counsel and QA officer each were aware of the mishandling of the "B" sample and the retesting results from the time they occurred.

49.     Defendant's false statements were used to justify the termination of Plaintiff's employment, and are of such a harmful nature that they are presumed to constitute defamation "per se." Defendants' statements imply that Dr. Uboh both concealed information and testified falsely in the Glefke/Farmer case, and have caused irrevocable harm to Plaintiff's personal and professional reputation.

50.     On January 17, 2018, the following article was published in "The Chronicle of the Horse" regarding the testing error that occurred in the Glefke/Farmer case:

> Discussion in the Veterinary Committee meeting during the U.S. Equestrian Federation Annual Meeting, now underway in Lexington, Kentucky, centered around the breaking news of the voiding of Larry Glefke and Kelly Farmer's GABA suspensions.
>
> Questions were raised about what kind of laboratory error resulted in the voiding of the suspensions, and what's going to be done in the future to prevent such errors.
>
> Though the organization's officials would not explain the exact error made, USEF general counsel Sonja Keating stated that the mistake in Glefke and Farmer's case was an isolated incident, not a pattern of errors.
>
> "What occurred in this particular matter is not related to any previous case. There was a B sample tested by the USEF laboratory in this case, and we have somebody who made a big mistake. There were errors in handling the sample. We didn't learn about the mistake until late." Keating said.
>
> "We didn't know about it at the time of [Glefke and Farmer's initial] hearing. I would not question any of the other GABA cases. They're not comparable. We can assure you this will not happened again. There were errors and we had to do the right thing." Keating continued.

USEF President Murray Kessler noted that when a USEF member receives notice of a positive sample, the member has the option to request that the B sample is tested in the USEF laboratory or at an alternative lab. Glefke and Farmer chose to have the USEF lab test the B sample in their GABA case.

"It was the preparation of the B sample," said Kessler. "After it was stored the mistake happened. It wasn't bad machinery. It was a handling mistake.

"While we'll continue to have their B samples tested, USEF, effective immediately; won't be the one doing the testing." Kessler said. "[USEF] rarely tests B samples. The main reason we've rarely tested is consumer demand. When people are going back for a second opinion, they'd rather it come from another lab. It's different. It's a frozen sample versus a fresh sample. I'm not saying we won't do it again in the future. But to reassure our membership right now until I've completed these audits, and I'm comfortable, we're going to send these samples to outside labs. It's the only way to reassure our membership that this can't happen to you."

Bill Moroney, the USEF CEO assured members that the USEF is taking steps to prevent a repeat of this mistake.

"The first thing that's happening is a comprehensive audit of the processes that go on in the lab and what happens with those samples to make sure we don't have problems," he said. "We have no idea why this mistake occurred, but going to put in place the checks and balances and take whatever corrective measures we need to.

"It's an independent outside person coming in to audit these processes," Moroney continued. "We also need to make sure there is a consistent mandatory training for all testing vets, that they clearly have the requirements that the federation mandates and they follow the requirements. We're learning as quickly as everybody else about the mistake that occurred in the lab, and we're putting in the appropriate checks and balances to make sure it does not occur [again]. There will be an independent audit report that will go to the board following the audit. That doesn't occur in a 24-hour period. It will take time for them to conduct that. In the interim, there will be things put into place to make sure quality control is happening."

Dr. Kent Allen, the chair of the Veterinary Committee and the USEF Drugs and Medication Committee, defensed the USEF testing program.

"We're not going to throw the baby out with the bath water here. This has been a pretty effective program," Allen said. "Apparently a mistake was made. There's going to be an audit. From the program standpoint it should happen. It should be in detail, and we should come up with a strategic plan going forward and a tactical plan to address any deficiencies.

"We're all saying the same things here—we get that it's a big deal. It's pretty hard

> not to be disheartened at his point. You've got to pick up and soldier on and figure
> out what the problem is and fix the problem. The war isn't going to stop because
> the skirmish went badly." Allen added.

*See* USEF CLARIFIES DISMISSAL OF GLEFKE AND FARMER SUSPENSIONS, The

Chronicle of the Horse, January 17, 2018, which is attached hereto as Exhibit "D". (Emphasis

Added).

51.     On February 1, 2018, USEF President Murray Kessler wrote a letter to the USEF

membership, which read in relevant part as follows:

> Unfortunately, I was extremely disappointed to report that we had a serious error
> in our laboratory's handling of a blood sample that left me no choice but to vacate the
> penalties on a high profile doping case. The respondents in that case requested that our
> laboratory test the "B" sample instead of the Maddy Equine Analytical Chemistry
> Laboratory based in CA. <u>As was previously disclosed, mistakes took place in the handling
> and preparation of the "B" blood sample. By our rules, if the "B" sample does not
> substantially confirm the "A" sample result, then the case is dismissed.</u>
>
> <u>What I found most upsetting about this situation was not the fact that a lab
> technician made a mistake, but rather that this information was not disclosed outside of the
> laboratory to management, our legal team or the Hearing Committee. Our legal team
> learned about these errors from opposing counsel, who disclosed this mistake and others.
> This is simply not okay and requires significant and immediate corrective action to restore
> confidence in USEF's drug testing program.</u> The following comprehensive actions have
> already been taken or have begun:
>
> 1.     <u>Laboratory Staffing Changes – Upon evaluation of the facts revealed in this case,
> we concluded that certain staffing changes were necessary and those have been
> implemented, including several changes in laboratory leadership.</u>

*See* Kessler letter, which is attached hereto as Exhibit "E". (Emphasis Added).

52.     Mr. Kessler's February 1, 2018 letter falsely states that USEF's counsel did not

learn of the testing mistake that occurred in the Glefke/Farmer case until it was disclosed to

USEF's outside counsel by opposing counsel. This is an outright lie. As set forth in Paragraphs

18 - 33 above, a representative of Ms. Keating's office was present in the laboratory when the

testing error occurred and USEF QA Officer Mullin was present and aware as well.

NOT ORIGINAL DOCUMENT
01/17/2019 02:51:25 PM
abarayje

53.     On February 7, 2018, the USEF issued a follow-up press release and letter concerning the Glefke/Farmer situation. In his letter summarizing the changes USEF was making to its laboratory procedures in the wake of the case, USEF CEO Bill Moroney wrote in relevant part as follows:

> Dear U.S. Equestrian Members,
>
> As a follow up to the letter you received last week from U.S. Equestrian President Murray Kessler, I am writing to provide you with further detail regarding our actions and changes involving the USEF Drugs & Medications Program and Laboratory.
>
> <u>Staffing Changes</u>
>
> <u>Effective last week, Laboratory Director Dr. Cornelius Uboh is no longer employed by the Federation.</u> In addition, a laboratory technician has also left his position as well. The Federation will not immediately conduct a national search for a Laboratory Director. We have engaged outside consultants to work with us to map and implement our transition plans and accredited external equine testing laboratories have agreed to assist USEF to ensure that our program continues to operate uninterrupted.

*See* Moroney letter, which is attached hereto as Exhibit "F". (Emphasis Added).

54.     Plaintiff is the only person identified by name in Mr. Moroney's letter as having been terminated from employment. Read in conjunction with Ms. Keating's statements and Mr. Kessler's letter, Mr. Moroney's letter effectively states that Plaintiff is the "somebody who made a big mistake" referenced by Ms. Keating.

55.     The statements were communicated to USEF Members and, in turn, republished to the general public through their availability on the internet. The injuries to Dr. Uboh's reputation caused by these statements are clear.

56.     These defamatory publications were susceptible to republication. It is believed, and therefore averred, that the defamatory publications were republished by the persons who first

NOT ORIGINAL DOCUMENT
01/17/2019 02:51:25 PM
abarayje

knew of them, thereby creating futher injuries to Dr. Uboh.

57.     The effective republication of the defamatory statements and the attendant injuries to Dr. Uboh were entirely forseeable to Defendants

58.     Dr. Uboh is damaged by the injuries to his reputation and suffered significant emotional distress as a result of those injuries.

Wherefore, Plaintiff respectfully prays that he be awarded damages consistent in an amount over $100,000.00, plus an award of attorneys' fees and costs.

## COUNT IV
## DEFAMATION

59.     Plaintiff reasserts paragraphs 1 through 58 as if stated in full and incorporates these paragraphs herein.

60.     On January 17, 2018, USEF General Counsel Sonja Keating was quoted in The Chronicle of the Horse newspaper as follows: "What occurred in this particular matter is not related to any previous cases. There was a B sample tested by the USEF laboratory in this case, and we have somebody who made a big mistake. There were errors in handling the sample. We didn't learn about the mistake until late," Keating said.  "We didn't know about it at the time of [Glefke and Farmer's initial] hearing."

61.     As set forth in Paragraphs 18 - 33 above, Ms. Keating's statement is false, as the USEF General Counsel's office knew of the mistake at the moment it happened, well before the Glefke and Farmer's initial hearing.  Although not identified by name, upon information and belief her statement that "we have somebody who made a big mistake" is a reference to Dr. Uboh.

62.     On February 1, 2018, USEF President Murray Kessler wrote a letter to the USEF membership, which read in relevant part as follows:

Unfortunately, I was extremely disappointed to report that we had a serious error

NOT ORIGINAL DOCUMENT
01/17/2019 02:51:25 PM
abarayje

in our laboratory's handling of a blood sample that left me no choice but to vacate the penalties on a high profile doping case. The respondents in that case requested that our laboratory test the "B" sample instead of the Maddy Equine Analytical Chemistry Laboratory based in CA. As was previously disclosed, mistakes took place in the handling and preparation of the "B" blood sample. By our rules, if the "B" sample does not substantially confirm the "A" sample result, then the case is dismissed.

What I found most upsetting about this situation was not the fact that a lab technician made a mistake, but rather that this information was not disclosed outside of the laboratory to management, our legal team or the Hearing Committee. Our legal team learned about these errors from opposing counsel, who disclosed this mistake and others. This is simply not okay and requires significant and immediate corrective action to restore confidence in USEF's drug testing program. The following comprehensive actions have already been taken or have begun:

1.      Laboratory Staffing Changes – Upon evaluation of the facts revealed in this case, we concluded that certain staffing changes were necessary and those have been implemented, including several changes in laboratory leadership.

*See* Exhibit "E". (Emphasis Added).

63.     Mr. Kessler's February 1, 2018 letter falsely states that USEF's counsel did not learn of the testing mistake that occurred in the Glefke/Farmer case until it was disclosed to USEF's outside counsel by opposing counsel. This is an outright lie. As set forth in Paragraphs 18 – 33 above, a representative of Ms. Keating's office was present in the laboratory when the testing error occurred and USEF QA Officer Mullin was present and aware as well.

64.     On February 7, 2018, the USEF issued a follow-up press release and letter concerning the Glefke/Farmer situation. In his letter summarizing the changes USEF was making to its laboratory procedures in the wake of the case, USEF CEO Bill Moroney wrote in relevant part as follows:

Dear U.S. Equestrian Members,

As a follow up to the letter you received last week from U.S. Equestrian President Murray Kessler, I am writing to provide you with further detail regarding our actions and changes involving the USEF Drugs & Medications Program and Laboratory.

Staffing Changes

> Effective last week, Laboratory Director Dr. Cornelius Uboh is no longer employed
> by the Federation. In addition, a laboratory technician has also left his position as well. The
> Federation will not immediately conduct a national search for a Laboratory Director. We
> have engaged outside consultants to work with us to map and implement our transition
> plans and accredited external equine testing laboratories have agreed to assist USEF to
> ensure that our program continues to operate uninterrupted.

*See* Exhibit "F".   (Emphasis Added).

65.      Plaintiff is the only person identified by name in Mr. Moroney's letter as having

been terminated from employment.  Read in conjunction with Ms. Keating's statements and Mr.

Kessler's letter, Mr. Moroney's letter makes clear that Plaintiff is the "somebody who made a big

mistake" referenced by Ms. Keating.

66.      The statements were communicated to United States Equestrian Members and are

available to the world on the internet.  The injuries to Dr. Uboh's reputation are clear.

68.      These defamatory publicatons were susceptible  to republication.  It is believed,

and teherefore averred, that the defamatory publications were republished by the persons who first

knew of them, thereby creating futher injury to Dr, Uboh.

69.      Republication of the defamatory statements and the attendant injuries to Dr. Uboh

were entirely forseeable to Defendants

70.      Dr. Uboh is damaged by the injuries to his reputation and suffers significant

emotional distress as a result of those injuries.

71.      The Defendants acted with a malicious and reckless disregard for the truth and the

reputation of Dr. Uboh and an award of punitive damages is appropriate.

**WHEREFORE,** Plaintiff Dr. Cornelius Uboh, respectfully demands as follows:

1.      Compensatory damages;

2.      Punitive Damages;

3.    Costs herein expended;

4.    Attorney's fees;

5.    Trial by jury;

6.    Any and all further releif to which Plaintiff may be entitled.

Respectfully Submitted,

/s/ John Abaray
**Tad Thomas**
**John Abaray**
THOMAS LAW OFFICES, PLLC
9418 Norton Commons Blvd, Ste 200
Louisville, KY 40059
877-955-7001
john.abaray@thomaslawoffices.com

Stephen V. Yarnell (PA Id. No.33360)
Law Offices of Stephen Yarnell
1101 Evergreen Road,
Reading, PA 19611
610-664-7883
*Pending Motion Pro Hac Vice*

Brian P. Kirby (PA Id. No.56345)
Brian P. Kirby, Attorney at Law
171 W. Lancaster Avenue, Ste. 100,
Paoli, PA 19301
610-578-9050
*Pending Motion Pro Hac Vice*

Filed          19-CI-00103    01/11/2019          Vincent Riggs, Fayette Circuit Clerk  NOT ORIGINAL DOCUMENT
                                                                      01/17/2019 02:51:25 PM
                                                                                 abarayje

## VERIFICATION

I, Cornelius Uboh, Plaintiff in the above captioned action, verify that the facts set forth in the foregoing Amended Complaint are true and correct to the best of my knowledge, information and belief.  I so verify subject to the penalties of 18 Pa.C.S.A. §4904, relating to unsworn falsifications to authorities.

Dated:  January 7, 2019

Cornelius E. Uboh, PhD

USEF Appoints Dr. Cornelius Uboh as Laboratory Director | US Equestrian                    1/6/19, 11:01 AM

The 2019 USEF Annual Meeting Registration is now open.

Home  /  Network & News  /  Press Releases  /  Article

SHARE:  f  🐦  

## USEF Appoints Dr. Cornelius Uboh as Laboratory Director

by USEF Communications Department | Sep 19, 2016, 2:30 PM EST

Lexington, Ky. - The United States Equestrian Federation (USEF) is pleased to announce the appointment of notable industry expert, Dr. Cornelius E. Uboh, as Laboratory Director of the USEF Equine Research and Testing Laboratory in Lexington, Ky. Prior to accepting the position with the USEF, Uboh served for 27 years as the Bureau Director of the Pennsylvania Equine Toxicology and Research Laboratory in West Chester, Pa. He was also an Adjunct Associate Professor of Pharmacology and Pharmacy in the Department of Clinical Studies at the University of Pennsylvania's School of Veterinary Medicine at the New Bolton Center campus. Uboh has authored and co-authored over 100 publications and has presented papers at numerous national and international conferences. Notably, Uboh, along with Dr. Lawrence R. Soma, VMD, led the efforts to develop and establish the world's first-ever method for confirming blood-doping agents in racehorse serum, commonly known as EPO.

"Dr. Uboh's knowledge, experience, and reputation globally made the decision to appoint him an easy one," said Dr. Stephen Schumacher, Chief Administrator of the USEF Drugs and Medications program. "He will be an asset to our Drugs and Medications program and is well-respected in the industry," Schumacher also noted that in 2012, Uboh was one of a select few in the thoroughbred industry invited to speak at the hearing of the United States House of Representatives Committee on Energy and Commerce Subcommittee on Health, supporting federal legislation to ban race-day medication in horses, known as the Interstate Horseracing Improvement Act.

"Dr. Uboh has been involved in meaningful breakthroughs in detecting doping in racehorses. We believe that his focus on sport horses will lead to new revelations that will help eradicate doping in our sport and strengthen the integrity of our sport in the United States," said Bill Moroney, USEF Chief Executive Officer.

"I look forward to helping solve the issues that confront the sport horse industry in the United States," said Uboh. "Intentional cheaters use substances that are undetectable through current testing protocols. We will change that. We will focus on identifying substances that are rife with potential for abuse and develop protocols for detecting those substances."

Uboh will begin his role effective immediately.

## EMPLOYMENT AGREEMENT

This Employment Agreement ("Agreement") is made and entered into as of the 19th day of September, 2016, by and between the United States Equestrian Federation, Inc., a New York not-for-profit corporation ("USEF"), and Dr. Cornelius Uboh, an individual residing in Pennsylvania ("Uboh"). USEF and Uboh are individually a Party and collectively the Parties

WHEREAS, USEF desires to employ Uboh as its Laboratory Director; and

WHEREAS, Uboh desires to accept such employment in accordance with the terms and conditions set forth herein.

NOW, THEREFORE, in consideration of the mutual promises and of the covenants contained in this Agreement USEF and Uboh agree as follows:

1. **Term of Employment.** The term of this Agreement shall commence on September 19, 2016 and continue for a period of five years, until September 19, 2021 unless terminated in accordance with the terms and conditions set forth in Section 4 of this Agreement ("Term"). Uboh's presence in the laboratory is not required until October 3, 2016. At the expiration of the Term, the Parties may renew this Agreement upon mutually agreeable terms

2. **Scope of Employment.**

   2.1. **Position and Duties.** During the Term of this Agreement, Uboh shall serve as the Laboratory Director, and shall perform such duties, consistent with the attached job description, which may change from time to time at the sole discretion of USEF. Such changes will not deviate from those duties typically required of a laboratory director of an equine drugs & medications testing laboratory. Uboh shall perform such duties and responsibilities at the laboratory located in Lexington, KY.

   In addition, the employee retention rates in the laboratory will remain a priority and will be reviewed on an annual basis to ensure no excessive turnover occurs. Uboh must exert his best efforts to develop employees to their fullest professional potential with the aim to develop his successor for when he departs USEF. The individual must be someone acceptable to USEF and capable of succeeding Uboh in all aspects in the role of Laboratory Director, and shall be mentored accordingly by Uboh.

   Uboh shall seek to maintain positive and productive relationships with the FEI and other laboratories designated as Reference Laboratories by the Federation Equestre Internationale ("FEI").

   2.2. **Daily Operation.** Uboh shall be responsible for the day-to-day operations of the laboratory, including the supervision of the activities of all employees in the

1

laboratory. Uboh is responsible for the development and administration of the annual budget as it relates to the laboratory.

2.2    **Efforts.**  Uboh agrees to serve USEF faithfully and to the best of his ability. Uboh agrees to devote all his business time, attention, and efforts to the interests and business of USEF.

2.3    **Compliance with Laws and Agreements.**  Uboh agrees at all times to adhere to and perform all laboratory duties both scientifically and in terms of employee relations in accordance with all applicable federal, state or local laws, rules and regulations, the terms of this Agreement, and USEF's Bylaws, policies, practices, procedures, and rules. Uboh represents and warrants to USEF that he is eligible to assume the employment contemplated by this Agreement and that he is not bound by any prior agreement, covenant, or restriction of any kind, with any prior employer or otherwise, that in any way restricts his freedom of employment, business activities, use or possession of information or ownership of intellectual property in connection with his employment with USEF.

2.4.    **Reporting.**  Uboh shall report to and be accountable to the USEF Chief Administrator of the Drug & Medication Program who will conduct Uboh's performance evaluations and recommend compensation.

3.      **Compensation, Benefits, and Expenses**

3.1    **Base Salary.**  Except as otherwise provided in this Agreement, effective upon September 19, 2016, USEF shall pay Uboh an annual salary of $200,000.00 ("Base Salary"), in equal bi-weekly payments less appropriate deductions for taxes and other amounts as agreed or as required by law to be withheld. Uboh will be eligible for merit increases in pay at the discretion of the USEF Chief Executive Officer. Merit increases are typically decided on an annual basis following performance reviews. Uboh will receive no fewer than one performance review per year.

3.2.    **Relocation Expenses.**  USEF shall advance Uboh reasonable relocation expenses not to exceed $20,000.00. These expenses include the actual costs for a professional moving company to move Uboh's personal belongings to KY as well as temporary housing for Uboh until he finds permanent housing in KY. Each year that Uboh serves USEF, 20% will be forgiven. For example, if Uboh serves only two years, upon his departure, he will owe 60% of the advance for expenses to USEF. If USEF terminates this Agreement without cause or in the event of Uboh's death, USEF will absorb 100% of this expense.

3.3.    **Coverage Under Health Insurance and Other Employee Benefit Plans.**  Uboh is eligible to participate in any USEF insurance plans, hospitalization plans, medical reimbursement plans, retirement plans, 401k plans, and other employee

benefit plans for which Uboh is qualified consistent with the established policies of USEF, as from time to time amended, for its executive staff.

3.4. **Sick Leave and Vacation**. Uboh shall be entitled to sick and personal leave in a manner consistent with the established policies of the USEF, as from time to time amended, for its executive staff.

3.5. **Expenses**. USEF shall reimburse Uboh for all reasonable and necessary out-of-pocket business expenses incurred in the course of performing his duties and rendering services hereunder, provided that Uboh timely submits to the USEF expense reports and substantiation of the expenses in accordance with USEF's requirements.

4 **Termination**. This Agreement may be terminated on the occurrence of any of the events or in the circumstances set forth in Subsections 4.1 - 4.4, below.

4.1. **Death and Disability**. In the event Uboh suffers from a disability, such that Uboh is unable to perform his duties and responsibilities under this Agreement by reasons of illness, injury or incapacity for a period of more than 180 consecutive days or more than 180 days in the aggregate, during any one-year period, this Agreement may be terminated. At all times USEF will abide by the Americans with Disabilities Act. Notwithstanding anything expressed or implied above to the contrary, USEF will fully comply with its obligations under the Americans with Disabilities Act, and with any other applicable federal, state or local law, regulation or ordinance, governing the protection of individuals with disabilities. This Agreement shall terminate upon Uboh's death. Upon either the occurrence of disability or death, Uboh (or Uboh's estate, as the case may be) shall be paid all unpaid Base Salary earned and accrued benefits through the date of termination of this Agreement.

4.2. **For Cause**. USEF may, at its sole discretion, terminate UBOH's employment for cause. For purposes of this Agreement, "Cause" means: (i) continuing material neglect by UBOH of or refusal by Uboh to perform his duties which, if curable, is not cured within thirty (30) days following written notice thereof from USEF; (ii) breach of a fiduciary duty or duty of loyalty to USEF, which, if curable, is not cured within thirty (30) days following written notice thereof from USEF;  (iii) fraud, embezzlement or other dishonest act or the commission of any act relating to the business or affairs of USEF involving moral turpitude by Uboh toward USEF;  (iv) a material breach of or substantial failure to perform any obligation of Uboh under this Agreement, if such breach or failure, if curable, is not cured within thirty (30) days after written notice is provided to Uboh; (v) any act of slander or libel by Uboh against USEF or any of its members, directors, employees or consultants; (vi) the conviction of or a plea of nolo contendere to any felony crime involving moral turpitude, or crime against USEF or its affiliates or any crime that constitutes a violation of the Safe Sport Policies, (vii) use of alcohol during work hours in a manner that materially impairs Uboh's ability to fully and effectively perform his job duties, or the use of illegal drugs or controlled substances (excluding substances prescribed by a health care professional and taken in

3

accordance with such prescription) at any time  In the event that Uboh's employment pursuant to this Agreement is terminated for Cause, Uboh will receive no salary or other benefits pursuant to this Agreement other than accrued but unpaid Base Salary and accrued benefits through the date of termination.

4.3.     **Without Cause by USEF**.  In the event USEF terminates this Agreement and Uboh's employment without Cause, Uboh will receive all accrued but unpaid salary and other benefits to the date of termination  In addition, provided Uboh (i) agrees to a written instrument satisfactory to USEF, in its sole discretion, to release USEF, its officers, directors, employees, agents and related entities, from any and all claims arising out of or related to Uboh's employment or termination of employment, (ii) acknowledges that the receipt of severance under this Agreement is subject to the terms and conditions of the written release, and (iii) continues to abide by post-employment obligations including, but not limited to, the obligations set forth in Sections 5, 6, 7, 8, and 9 of this Agreement, Uboh will receive severance pay in an amount equal to 12 months of Base Salary plus Fringe Benefits (at the rate in effect as of the termination date).  Such severance pay will be paid as salary continuation, in equal monthly installments, commencing within forty-five (45) days following Uboh's termination, provided he has then executed a separation agreement and release satisfactory to USEF in its reasonable discretion.  If Uboh dies before all severance payments have been made, USEF will continue to make the payments to Uboh's beneficiary on the same schedule as the payments would have been made to Uboh had he lived.  With the exception of any benefits provided pursuant to Section 3.3 of this Agreement, all other benefits and perquisites of employment provided under this Agreement will cease upon UBOH's termination of employment.

4.4.     **Without Cause by Uboh**.  This Agreement may be terminated by Uboh upon 180 (180) days written notice (the "Notice Period").  If Uboh provides such notice, USEF may immediately terminate Uboh's employment without notice or provide compensation in lieu of notice.  Regardless of the effective date of the termination, Uboh will be entitled to payment of his Base Salary plus Fringe Benefits (at the rate in effect as of the termination date) and other accrued benefits through the end of the Notice Period and any benefits provided pursuant to Section 9 of this Agreement less any bonus.

4.5.     For a period of four months after Uboh is no longer employed by USEF, Uboh will not, directly or indirectly, consult or otherwise provide services that are adverse to any aspect of the USEF Equine Drugs & Medications Program. Specifically, unless provided written authorization from USEF, Uboh will not consult with anyone concerning any drug/medication samples that have been received by the USEF laboratory prior to Uboh's departure. This precludes sharing any information that could be reasonably considered as assisting someone with a positive sample that violates USEF rules.

4

5. __Confidentiality.__

5.1. __Confidential Information.__ Uboh has and will have access to and participate in the development of or be acquainted with confidential or proprietary information and trade secrets related to the business of USEF, including but not limited to i] proprietary information about the laboratory, testing methods, drug testing, business plans, systems reports, software programs, operating plans, marketing plans, budgets, terms of agreements with customers and others, membership lists, reports, correspondence, tapes, disks, tangible property and specifications owned by or used in USEF's businesses future marketing plans or ideas, and plans or ideas for new services, information and data relating to USEF's strategic plan, (ii) all information which is learned or developed by Uboh in the course and performance of his duties under this Agreement, and (iii) other tangible and intangible property which is used in the business and operations of USEF but not made publicly available (collectively, "the Confidential Information")

5.2. __Treatment of Confidential Information.__ Uboh will take all reasonable steps to safeguard the Confidential Information, as defined above, and will not, directly or indirectly, disclose, use or make known for his or another's benefit any of the Confidential Information or use such Confidential Information in any way except in the best interests of USEF in the performance of Uboh's duties under this Agreement.

6. __Return of Company's Property.__ Immediately upon the effective date of Uboh's termination, or such other date and time that is agreed upon, Uboh will deliver to USEF any computers, cellular telephones, smart phone or similar electronic devices, facsimile machines, swipe cards or keys to USEF's premises which he agrees to vacate within fifteen (15) days of termination, and all of USEF's Confidential Information, as defined above, in whatever format it is then maintained or stored, including electronic format.

6.1. __Survival of Obligations.__ The obligations of Uboh and USEF under this Section 7 will survive the termination of Uboh's employment and the expiration or termination of this Agreement

6.2. __Remedies.__ Each of the Parties hereto will have all rights and remedies set forth in this Agreement. All remedies hereunder are cumulative and are not exclusive of any other remedies provided by law or any other agreement or contract to which such person is a party. Each Party will be entitled to enforce such rights specifically (without the requirement of posting a bond or other security), to recover damages by reason of any breach of any provision of this Agreement and to exercise all other rights granted by law without limiting the generality of the foregoing, Uboh specifically agrees that any breach or threatened breach of Sections 6 and 7 would cause irreparable injury to USEF, that money damages would not provide an adequate remedy to USEF, and that USEF will, accordingly, have the right and remedy: (i) to obtain an injunction prohibiting Uboh from violating or threatening to violate such

provisions, (ii) to have such provisions specifically enforced by any court of competent jurisdiction, and (iii) to require Uboh to account for and pay over to USEF all compensation, profits, monies, accruals, increments or other benefits derived or received by Uboh as the result of any transactions constituting a breach of such provisions.

7.  **Failure, Delay or Waiver.** No course of action or failure to act by USEF or Uboh will constitute a waiver by the Party of any right or remedy under this Agreement, and no waiver by either Party of any right or remedy under this Agreement will be effective unless made in writing.

8.  **Severability.** Whenever possible, each provision of this Agreement will be interpreted in such a manner as to be enforceable under applicable law. However, if any provision of this Agreement is deemed unenforceable under applicable law by a court having jurisdiction, the provision will be unenforceable only to the extent necessary to make it enforceable without invalidating the remainder of it or any of the remaining provisions of this Agreement.

9.  **Notice.** All notices under this Agreement shall be delivered by hand, email, facsimile transmission, overnight delivery service, or registered or certified mail. Notices intended for Uboh shall be addressed to Uboh at the address contained in USEF's personnel records from time to time and, if for USEF, shall be addressed to: Sonja S. Keating, General Counsel, United States Equestrian Federation, 4047 Iron Works Parkway, Lexington, KY 40511, fax: (859) 231-7371. All notices shall be effective upon actual delivery.

10.  **Miscellaneous.** This Agreement (i) may not be amended, modified or terminated orally or by any course of conduct pursued by USEF or Uboh, but may be amended, modified or terminated only by a written agreement duly executed by USEF and Uboh, (ii) is binding upon and inures to the benefit of USEF and Uboh and each of their respective heirs, representatives, successors and assignees, except that Uboh may not assign any of his rights or obligations pursuant to this Agreement, (iii) supersedes any prior written or oral agreement and constitutes the entire agreement between USEF and Uboh with respect to such subject matter, and (iv) will be governed by, and interpreted and construed in accordance with, the laws of the Commonwealth of Kentucky without regard to principles of conflicts of law.

11.  **Consent to Jurisdiction and Venue.** Each of the USEF and Uboh hereby (i) consents to the jurisdiction of the United States District Court for the District of Kentucky, or, if such court does not have subject matter jurisdiction over such matter, the appropriate Commonwealth of Kentucky Court, and (ii) irrevocably agrees that all actions or proceedings arising out of or relating to this Agreement shall be litigated in such court. Each of the USEF and Uboh accepts for itself or himself and in connection with its or his properties, generally and unconditionally, the exclusive jurisdiction and

6

venue of the aforesaid courts and waives any defense of forum non conveniens or any similar defense.

12.   **Independent Legal Advice.** Uboh acknowledges that he has read and understands this Agreement, and acknowledges that he has had the opportunity to obtain independent legal advice with respect to it.

13.   **Counterparts.**   This Agreement may be executed in one or more counterparts, each of which will be deemed to be an original copy of this Agreement and all of which, when taken together, will be deemed to constitute one and the same agreement.

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the day and year above first written.

Cornelius Uboh, PhD

Date: 9/19/2016

United States Equestrian Federation, Inc.

By ................................   Date: 9/19/16

William J. Moroney, Chief Executive Officer

7

CONFIDENTIAL
SEVERANCE AGREEMENT AND GENERAL RELEASE

This **Severance Agreement and General Release** ("Agreement") is made as of the date of later execution hereof by **United States Equestrian Federation, Inc.,** a New York not-for-profit corporation with its principal place of business at 4047 Ironworks Parkway, Lexington, Kentucky 40511 ("USEF"), and **Cornelius Uboh,** an individual residing at, 130 Conway Court, Exton, PA 19341 Lexington, KY 40511 ("Employee").

WHEREAS, Employee has been employed as the Laboratory Director since September 19, 2016 pursuant to an Employment Agreement executed on September 19, 2016;

WHEREAS, USEF and Employee agree to terminate Employee's employment with USEF;

WHEREAS, USEF and Employee mutually agree to terminate Employee's Employment Agreement with USEF;

WHEREAS, Employee's employment with USEF is terminated effective January 31, 2018;

WHEREAS, the parties desire to resolve all issues related to Employee's separation from employment and have entered into this Agreement with the intent of finally resolving all claims and issues relating to Employee's employment and separation from employment; and

NOW, THEREFORE, in consideration of the mutual promises contained herein, the parties agree and covenant as follows:

1.    **Termination.**  Employee's employment with USEF shall terminate on January 31, 2018 (the "Termination Date").

2.    **Severance Offer and Covenants.**    The following shall, in combination, constitute USEF's "Severance Offer":

(a)    USEF shall pay to Employee severance pay ("Severance Pay") in an amount equal to 3 months of his Base Salary, which is Two Hundred Thousand Dollars ($200,000.00) annually, in biweekly installments on the regular payroll cycle, less all regular withholdings, including any other deductions for taxes and other amounts required by law to be withheld. Severance Pay will be paid on the regular payroll dates applicable to Employee's position with USEF, provided that USEF is not obligated to pay any Severance Pay before this Agreement becomes effective. If USEF does not make one or more payments of Severance Pay on a regular payroll date because this Agreement has not yet become effective, USEF shall make such payments by the first payroll date after the Agreement becomes effective. Employee acknowledges that this is compensation to which he is not otherwise entitled.

(b)    USEF shall continue to provide Employee with all Fringe Benefits (at the rate in effect as of the Termination Date) for a period of three months; provided however, any health insurance coverage shall be continued as provided in Paragraph 2(c) below. USEF shall compensate Employee for two earned but unused days of PTO.

(c)     If Employee elects continuing health coverage under COBRA, USEF shall pay the "single" cost of the COBRA coverage selected by Employee for a period of three months, but not beyond the date Employee becomes eligible for group health plan coverage elsewhere. Employee shall be responsible for paying the entire COBRA cost for the remainder of the COBRA continuation coverage period if he elects to continue coverage beyond the three months.

(d)     USEF shall undertake to make deductions, withholdings and tax reports with respect to the payments and benefits under this Agreement to the extent that it reasonably and in good faith determines that it is required to make such deductions, withholdings and tax reports.  Payment to Employee under this Agreement shall be in amounts net of any such deductions or withholdings.  Nothing in this Agreement shall be construed to require USEF to make any payments to compensate Employee for any adverse tax effect associated with any payments or benefits or for any deduction or withholding from any payment or benefit.

(e)     USEF advanced Employee $20,000.00 in moving expenses to be forgiven 20% each year of service (333.33 per month over 60 months). The balance due back to Employer is $14,999.85 (333.33/mo for 45 months).  Employer agrees not to seek reimbursement of the remain amount.

3.     **Cooperation and Assistance.**  Employee promises and agrees that he will cooperate with the prepration for and presentation to the USEF Hearing Committee for matters that are pending as of the date of this Agreement, if requested. If requested, Employee promises and agrees that he will testify in hearings for the USEF. USEF will reimburse Employee for his time in an amount of $175.00 per hour in addition to reasonable expenses.

4.     **Waiver and Full Release.**

(a) Employee promises and agrees not to sue or otherwise assert a claim and to fully and completely release USEF and all of its current and former officers, directors, employees, agents, members and related entities ("Released Parties") from any and all claims, including but not limited to claims arising under the Kentucky Civil Rights Act, KRS Chap. 344; the Kentucky Whistleblower statute, KRS §§ 61.101- 61.103; the Kentucky Equal Opportunities Act, KRS §§ 207.130-207.160; the Kentucky Wage and Hour laws, KRS Chap. 337; the Kentucky Workers' Compensation laws, KRS Chap. 342; Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e et seq.; the Rehabilitation Act of 1973, 29 U.S.C. §§ 701 et seq.; the Americans with Disabilities Act, as amended, 42 U.S.C. §§ 12101 et seq.; the Employee Retirement Income Security Act (ERISA), 29 U.S.C. §§ 1001 et seq.; the Fair Labor Standards Act of 1938, 29 U.S.C. 201 et seq.; the Family and Medical Leave Act, 29 U.S.C. §§ 2601 et seq.; the Age Discrimination in Employment Act, 29 U.S.C. §§ 623 et seq.; the Sarbanes-Oxley Act, 29 U.S.C. §§ 1021, 1131-1132; and any other related or unrelated federal, state, or local statute or ordinance, and common law tort, breach of contract, promissory estoppel, wrongful termination or any other claims, including claims for fees or damages that have been, could be or could have been asserted by Employee or on his behalf in any forum arising out of or connected with his employment with USEF, and from all liability whatsoever up to the date of the Agreement, whether now known or unknown. This release expressly includes any claim Employee may have for salary, wages, bonuses, overtime pay, vacation pay or other form of compensation arising from his employment with USEF.

(b) Employee acknowledges that certain claims for alleged discrimination that he might otherwise have desired to assert in connection with his employment may depend in part on the

2

identity of the person, if any, selected by USEF to assume his job duties, and that notwithstanding the fact that the identity of any such person may not yet be known, Employee intends by the Agreement to release USEF from and waive all such claims.

(c) Employee agrees not to hereafter encourage, or in any way, assist or cooperate with any other person or entity (except as expressly required and compelled by law) in any matter or proceeding of any kind or nature against any or all of the Released Parties relating to any matter arising out of Employee's employment with USEF and/or his separation therefrom, or with regard to the employment and/or separation of any other individual(s) by USEF or any Released Party, and except as required and compelled by law, he shall not provide information to any other person for such purpose(s). Employee agrees that he will not initiate, facilitate, or engage in communication or conduct with any person or entity for the purpose of doing anything prohibited by this Paragraph. This provision shall not prohibit Employee from filing a charge with or participating in any investigation or proceeding conducted by the EEOC or any comparable state or local agency, but Employee agrees to waive and give up any right to recover monetary damages with respect to any charge, complaint, or lawsuit filed by Employee or anyone on Employee's behalf.

(d) Employee represents he does not claim an interest in, has not made any claims, or has not filed any complaints or charges against any or all of the Released Parties with any local, state, or federal department, agency or court.

(e) In the event that, for any reason, any complaint, suit, action, charge, claim or proceeding covered by paragraph 4(a) of this Agreement is pending or instituted on Employee's behalf, Employee agrees to immediately seek and obtain dismissal with prejudice of any such complaint, suit, action, charge, claim or proceeding (unless such proceeding is a class action, in which case Employee agrees to "opt out" of the class and not participate in the class action). Employee expressly waives any claim to any form of monetary or other damages or any other form of recovery or relief in connection with any complaint, suit, action, charge, claim or proceeding, whether brought by Employee or any other party on Employee's behalf.

(f) Notwithstanding any other provision herein, nothing in this Agreement does, will or is intended to affect, release, waive or otherwise impact: (i) any right which is not subject to waiver as a matter of law or any right which arises after the Effective Date of this Agreement; (ii) whatever rights Employee has to any vested interest in any USEF retirement plans or 401K; (iii) whatever rights to continuing health insurance coverage Employee may elect under COBRA; (iv) rights to reimbursement of qualified business expenses incurred prior to the Termination Date and properly documented to USEF; (v) rights to recover and retrieve Employee's personal property located at USEF's offices; and (vi) any rights and obligations created pursuant to this Agreement.

5.    **Confidentiality.**

(a) Employee agrees to keep confidential the existence of, and the terms and conditions of this Agreement, as well as the content of discussions and negotiations pertaining to the Agreement.

(b) As the Laboratory Director of USEF, Employee acquired nonpublic, competitively sensitive, confidential and/or proprietary information relating to the organization, the business, employees, or individuals associated with USEF and/or USEF employees, volunteers, consultants, and sponsors including, by way of example and not limitation: information such as

3

strategies, initiatives, project development ideas, pricing and marketing techniques; information and details related to testing and methods; information related to positive samples and rule enforcement; confidential projects; information about the laboratory, testing methods, drug testing; past, existing and future contractual arrangements; all information learned or developed by Employee in the course and performance of his duties; personnel, revenue, tax and financial information; information concerning USEF's intellectual property, trade secrets or any other similar information in any form, including without limitation, oral communications, notes, documents, files, records and any other written form or in any magnetic, electronic, computer, tape, digital or other recorded medium ("Confidential Information"). Employee agrees to maintain in absolute and strict confidence and not to use or disclose to any third party, any such Confidential Information obtained by Employee during his employment with USEF or while at any time providing services to USEF. Employee acknowledges and agrees that this obligation of confidentiality shall continue from the Termination Date and thereafter in perpetuity. Any breach of such confidentiality obligation shall terminate any obligations of USEF hereunder. Specifically excluded from the term "Confidential Information" is information which was (i) at the time of the disclosure, generally available to the public; (ii) becomes available on a non-confidential basis from a source other than Employee; or (iii) information that is required to be disclosed by Employee pursuant to subpoena provided that Employee shall first notify USEF as soon as practicable following the receipt thereof and it shall be USEF's obligation, at its cost, to intervene to quash or limit the scope of the subpoena.

(c) Employee acknowledges and agrees that any violation of this confidentiality provision causes irreparable harm to USEF, and that it shall be entitled to injunctive relief, if sought, as well as monetary damages, from Employee to compensate USEF for any injury sustained as a consequence of Employee's breach of this provision. Further, Employee specifically acknowledges and agrees that the value of any harm sustained by USEF as a result of Employee's breach of this material provision shall be equal to the amount of any and all payments and benefits that Employee may receive or otherwise be entitled to receive pursuant to the terms of this Agreement, which amount Employee specifically agrees to reimburse to USEF or waive his right to receive pursuant to this Agreement in the event of such a breach.

6.      **Miscellaneous.**

(a) **Return of Property.** Employee has returned all USEF property in his possession or under his control, including, without limitation, all keys, access cards, parking permits, personal I.D.'s and any and all original, copied, or reproduced business records, files, correspondence, notes, memoranda, diskettes, lists, audio or video tapes, whether in written form or in any magnetic, electronic, tape, computer, digital or other recorded medium, and all materials that he has in his possession or under his control, whether created or acquired prior to his employment with USEF or that subsequently may come into his possession or control, relating to USEF and/or any USEF officers, volunteers, employees, sponsors, or consultants, and anything done by Employee in the course of Employee's employment, or concerning information that relates to the business, operation or personnel of USEF, it being agreed that all such materials and the information contained therein for all time remain the sole property of USEF.

(b) **No Disparaging Remarks.** Employee agrees that he will not do or say anything, nor make any disparaging or negative remarks or comments, that a reasonable person would expect might diminish, constrain or adversely affect the good will and reputation of USEF, any of USEF's current employees, volunteers, consultants, and sponsors or their products and services, whether verbally or in writing from the date of this Agreement and thereafter for a period of one year.

4

USEF agrees that the senior staff (CEO and his direct reports) will not do or say anything, nor make any disparaging or negative remarks or comments, that a reasonable person would expect might diminish, constrain or adversely affect the reputation of Employee, whether verbally or in writing from the date of this Agreement and thereafter for a period of one year.

(c) **No Admission of Liability.** Employee acknowledges and agrees that any payments by USEF hereunder shall not be deemed to be an admission of any liability or responsibility.

(d) **Unemployment Insurance.** USEF agrees that it will not contest any claim for unemployment insurance benefits made by Employee following the Termination Date. Accurate information will be provided by USEF as requested by the Commonwealth of Kentucky. Employee acknowledges that any determination as to whether he is entitled to unemployment insurance benefits is made by the Commonwealth of Kentucky, not USEF, and that USEF has not made any representation to Employee that he will, in fact, receive unemployment insurance benefits.

(e) **Entire Agreement.** This Agreement sets forth the entire agreement between Employee and USEF and supersedes any prior and contemporaneous oral or written agreements or understandings between the parties, except as provided herein. Employee represents that he has not relied upon any statements or representations or other matters from USEF or its agents, officers or employees, other than as set forth herein. This Agreement cannot be amended, modified or supplemented in any respect except by a subsequent written agreement signed by both parties.

(f) **Choice of Law.** Employee acknowledges and agrees that this Agreement shall be governed by, and interpreted in accordance with the laws of the Commonwealth of Kentucky, without regard to its conflict of laws provisions.

(g) **Non-Severability.** The parties agree that should any provision of this Agreement be declared or determined by any court of competent jurisdiction to be illegal, invalid or unenforceable, the validity of the remaining parts, terms or provisions shall not be affected thereby and any illegal, invalid or unenforceable part, term or provision shall be deemed not to be a part of this Agreement. In such event, the parties desire that the court should impose any lesser restrictions it considers appropriate to protect the interest of Employee, USEF, as may be applicable, to the greatest extent legally enforceable.

(h) **Enforcement.** Any action to enforce this Agreement shall be brought in the United States District Court for the Eastern District of Kentucky, Central Division. If the federal court lacks jurisdiction over such enforcement action, then the action shall be brought in the Fayette Circuit Court in Lexington, Kentucky.

(i) **Successors.** This Agreement shall apply to Employee, as well as Employee's heirs, agents, executor, and administrators. This Agreement shall apply to, and inure to the benefit of USEF, its parents, successors, assigns, and each employee, agent, representative, officer, or director of USEF and any division, subsidiary, parent, or affiliated entity of USEF.

(j) **Exclusive Remedy.** Employee acknowledges and agrees that the relief provided in this Agreement is his exclusive remedy for his separation from USEF and that USEF has no further obligations to him.

5

7.    **Informed Consent; Right of Revocation.** Exclusively as this Agreement pertains to his release of claims under the Age Discrimination in Employment Act of 1967, as amended ("ADEA"), Employee, pursuant to and in compliance with the Older Workers Benefit Protection Act: (i) is advised in writing to consult with his attorney prior to executing this Agreement; (ii) has been afforded a period of twenty-one (21) calendar days to consider this Agreement; and (iii) may revoke this Agreement (only with regard to his ADEA waiver and release) during the seven (7) calendar days following its execution. To the extent he executes this Agreement prior to the expiration of the twenty-one (21) calendar day period specified above, Employee acknowledges and agrees that he was afforded the opportunity to have at least twenty-one (21) calendar days to consider it before executing it and that his execution of the Agreement prior to the expiration of said period was his voluntary act. Employee also agrees that this Agreement is written in a manner that enables him to fully understand its content and meaning. He also agrees that he is waiving and releasing claims (including any ADEA claim) in exchange for valuable consideration identified above that is in addition to anything of value to which he already is entitled.

This Agreement, as it pertains to a release of claims under the ADEA, shall become effective and enforceable seven (7) calendar days after its execution ("Effective Date"). All other provisions of this Agreement or parts thereof shall become effective and enforceable upon execution; provided, however, that if Employee revokes this Agreement as provided in (iii) above, USEF may revoke this Agreement in its entirety during the seven (7) calendar day period following receipt of his revocation.

8.    **Right to Consult an Attorney.** Employee has the right to consult with an attorney prior to executing this Agreement.

BY SIGNING BELOW, EMPLOYEE ACKNOWLEDGES THAT HE FULLY UNDERSTANDS AND ACCEPTS THE TERMS OF THIS AGREEMENT, AND REPRESENTS AND AGREES THAT HIS SIGNATURE IS FREELY, VOLUNTARILY AND KNOWINGLY GIVEN. EMPLOYEE FURTHER ACKNOWLEDGES THAT HE HAS BEEN PROVIDED A FULL OPPORTUNITY TO REVIEW AND REFLECT ON THE TERMS OF THIS AGREEMENT. EMPLOYEE ACKNOWLEDGES THAT HE HAD AMPLE TIME IN WHICH TO CONSIDER, UNDERSTAND THIS AGREEMENT, AND REVIEW THIS AGREEMENT.

IN WITNESS WHEREOF, USEF hereby executes and delivers this Severance Agreement and General Release on this 31st day of January, 2018.

WITNESS:

S. current

UNITED STATES EQUESTRIAN
FEDERATION, INC.

By: William D. Mercury

Its: Chief Executive Officer

IN WITNESS WHEREOF, Employee hereby executes and delivers this Severance Agreement and General Release on the date set forth below.

WITNESS:

CORNELIUS UBOH

Date: _____

6

3/28/2018                                    The Chronicle of the Horse



## USEF Clarifies Dismissal Of Glefke And Farmer Suspensions

By Mark Sorge
Jun 17, 2016 • 12:27 PM

 

Share

Discussion of the Watershed Controversy meeting during the Mid-Equitation an Federation Annual Meeting was overdue by the Lexington, Kentucky, centered around the breaking news of the voiding of Larry Glefke and Kelley Farmer's GABA suspensions.

Questions were raised about what kind of laboratory error resulted in voiding of the suspensions, and what's going to be done in the future to prevent such errors.

Though the organization's officials would not explain the exact error made, USEF general counsel Sonja Keating stated that, the mistake in Glefke and Farmer's case was an isolated incident, not a pattern of errors.

"What occurred in this particular matter is not related to any previous cases. There was a B sample tested by the USEF laboratory in this case, and we have somebody who made a big mistake. There were errors in handling the sample. We don't learn about the mistake until later," Keating said.

"We didn't know about it at the time of [Glefke and Farmer's initial] hearing. I would not question any of the other GABA cases. They're not comparable. We can assure you this will not happen again. There were errors, and we had to do the right thing," Keating continued.

USEF President Murray Kessler noted that when a USEF member receives notice of a positive result from the A sample, the member has the option to request that the B sample is tested in the USEF laboratory or at an alternative lab. Glefke and Farmer chose to have the USEF lab test the B sample in their GABA case.

"It was the preparation of the B sample," said Kessler. "After it had been stored, the mistake happened. It wasn't bad machinery. It was a handling mistake."

"While we'll continue to allow people to have their B samples be retest, USEF, effective immediately, won't be the one doing that testing," Kessler said. "[USEF] rarely tests B samples. The main reason we've rarely tested is consumer demand. When people are going back for a second opinion, they'd rather it come from another lab. It's different. It's a frozen sample versus a fresh sample. I'm not saying we won't do it again in the future. But to reassure our membership right now until I'm completely these audits, and I'm comfortable, we're going to send these samples to consider this, it's a way to reassure the membership that this can't happen to you."

Bill Moroney, the USEF CEO assured attendees at the meeting that the USEF is taking steps to prevent a repeat of the mistake.

"The first thing that's happening is a comprehensive audit of the processes that go on in the lab and what happens with those samples to make sure we don't have problems," he said. "We have no idea why this mistake occurred, but we're going to put in place the checks and balances and take whatever corrective measures we need to.

"It's an independent outside person coming in to audit these processes," Moroney continued. "We also need to make sure there is consistent mandatory training for all testing sets, but they clearly have the requirements that the federation mandates and they follow the requirements. We're learning as quickly as everybody else about the mistake that occurred in the lab, and we're putting in the appropriate checks and balances to make sure it does not occur [again]. There will be an independent audit report, that will go to the board following the audit. That doesn't occur in a 24-hour period. It will take 3 or them to conduct that. In the interim, there will be things put in place to make sure quality control is happening."

Dr. Kent Allen, the chair of the USEF Veterinary Committee and the USEF Drugs and Medication Committee, defended the USEF testing program.

"We're not going to throw the baby out with the bath water here. This has been a very effective program," Allen said. "Apparently a mistake was made. There's going to be an audit. From the program standpoint it should happen, it should be in detail, and we should come up with a strategic plan going forward and a tactical plan to address any deficiencies.

"We're all saying the same thing here—we get that its a big deal. It's pretty hard not to be disheartened at this point. You've got to pick up and soldier on and figure out what the problem is and fix the problem. The war isn't going to stop because this stream went bad," Allen added.

Read all the coverage of Kelley Farmer and Larry Glefke suspension in 2017, including Sorge's non-watershed from these regularly from these and more.

Category: News

Tags: Drugs And Medication, Glefke & Farmer 2017 Suspensions, Kelley Farmer, Larry Glefke, USEF, USEF Convention



0 Comments                                          Sort by   Newest

Add a comment...

Facebook Comments plugin

3/26/2018                                    The Chronicle of the Horse

 

## USEF President Murray Kessler Announces Changes To USEF Drug Testing Procedures

By: Edited Press Release
Feb 1, 2019 - 10:40 AM

Share



On Jan. 17, the U.S. Equestrian Federation announced it had exonerated Kelley Farmer and Larry Glefke from their alleged July 2016 GABA violation. The decision came after arbitration revealed that errors occurred in the laboratory's handling of the blood sample in the case.

At the USEF annual meeting questions were raised about what kind of laboratory error occurred and what's being done to prevent errors in the future. The USEF ordered an outside comprehensive audit of the laboratory's process and said it would address any error cycles found.

On Feb. 1, USEF President Murray Kessler released a letter to membership discussing steps that are being taken to prevent another error happening the sample collecting and testing.

3/28/2018                                      The Chronicle of the Horse

Dear Fellow Members,

We just finished our Annual Meeting in Lexington, Kentucky where we reported on the great results of the first year of our Strategic Plan. I was happy to report that we grew membership for the first time in years, increasing almost 30% to over 105,000 members. We also reported strong financial results, growing financial reserves, 23 signed and/or re-signed sponsors, new initiatives launched to strengthen the developmental pathway for horses and riders, increase access to our sport across all disciplines, and we had one of the greatest years ever for the United States in international and national sports competition. All very positive news!

Unfortunately, I was extremely disappointed to report that we had a serious error in our laboratory's handling of a blood sample that left me no choice but to vacate the penalties on a high profile doping case. The respondents in that case requested that our laboratory test the "B" sample instead of the Maddy Equine Analytical Chemistry Laboratory based in CA. As was previously disclosed, mistakes took place in the handling and preparation of the "B" blood sample. By our rules, if the "B" sample does not substantially confirm the "A" sample result, then the case is dismissed.

What I found most upsetting about this situation was not the fact that a lab technician made a mistake, but rather that this information was not disclosed outside of the laboratory to management, our legal team or the Hearing Committee. Our legal team learned about these errors from opposing counsel, who disclosed this mistake and others. This is simply not okay and requires significant and immediate corrective action to restore confidence in USEF's drug testing program. The following comprehensive actions have already been taken or have begun:

1. Laboratory Staffing Changes – Upon evaluation of the facts revealed in this case, we concluded that certain staffing changes were necessary, and those have been implemented, including several changes in laboratory leadership.

2. Full Lab Assessment – As previously announced, we are conducting a comprehensive assessment of the laboratory and its procedures. We have identified several outstanding and independent professionals from Europe to perform this function. The scope of the assessment includes making recommendations on best practices, identifying any deficiencies so that immediate corrective measures can be taken and evaluating the skills of the personnel to ensure we are maximizing every employee's potential and capabilities and have no skill gaps in the team.

3. "B" Sample Testing Procedure Change – USEF will still give members this option to have their "B" sample tested, however, USEF's laboratory will no longer be an option for conducting this testing. One of the things I learned so far is how different "B" sample testing is from "A" sample testing. USEF tests approximately 8,500 "A" blood samples per year. Over the past ten years, the USEF Lab has tested approximately 85,000 "A" blood samples which come into the lab and results refrigerated before processing. "B" samples undergo a different process for testing because they are frozen for a period of time until they are pulled for testing. Here's the surprising part. USEF has only tested a few "B" samples in the last 10 years. Most people in the USEF lab have never handled a "B" sample. Why is that? Simple. Almost everyone wants their "B" sample tested at a different laboratory than where the "A" sample was tested. Therefore, they do not request USEF to test the "B" sample. Eliminating the USEF option immediately rules out the possibility of this mistake happening again.

4. Sample tracking – Our team met with a consultant last week regarding the development and installation of a new upgraded sample tracking system that will electronically document the chain of custody of every sample that is delivered to the lab, from reception until it's discarded. In the meantime, we are putting in place additional documentation controls for our existing tracking system to ensure all of our documentation requirements are completed for every sample.

5. Laboratory Strategic Planning Task Force – As I announced at our Annual Meeting, I have appointed Tom O'Mara to chair a task force to do a strategic review of our laboratory including an evaluation of whether USEF should outsource it. Tom has decades of experience working on the institutional trading floor of a number of global investment banks. He has successfully managed risks through extreme market cycles. He will lead a thorough cost-benefit analysis and will provide a report to the Board no later than the Mid-Year meeting in June 2018.

6. Drug Sample Collection – We have expanded our evaluation to include drug sample collection. This will include a change in the type of kits the Testing Teams use as well as conducting additional training for the testing teams, including one-on-one training, to ensure the protocols are well understood and followed and to ensure a positive interaction between the exhibitor and testing team. In addition, USEF will provide opportunities at competitions for members to witness sample collection while the process is explained.

7. Employee Whistleblower Policy – As I already stated, it was the lack of disclosure that most upset me in this process. We must have an environment where employees report to leadership anything they think violates USEF policies and procedures or is otherwise improper. This program already exists but needs reinforcing. This is underway.

8. Integrity Program – Finally, we are excited to announce that today we are launching an Integrity Program that will provide members with the opportunity to report issues in the field regarding testing as well as intelligence regarding conduct and practices that are contrary to the USEF rules and regulations. Those reports should be directed to Integrity@usef.org

As I said when I volunteered for this job one year ago, "Getting Our Own House in Order" was the first step in our Strategic Plan. This is a great example of what I meant. I hope the actions above reassure you that we are fixing the mistakes that were identified in our laboratory. I also hope we have demonstrated that Bill Moroney, CEO, his leadership team and the Board will always operate with integrity and in fairness to all members. Importantly, our commitment to ridding our sport of cheaters and abusers remains fully intact. The Board, Management and I will not relent on this paramount objective. We made great progress in this area in 2017 with a 22 percent decline in positive doping tests. That change, combined with all of the great results USEF is having, bode well for our organization's future.

We will continue to give you updates on the lab and our actions to ensure this program operates in accordance with policies and procedures and regains your confidence. We have much to do on "Share the Joy of Horse Sports with as Many People as Possible" as we go in to year two of our Strategic Plan. We look forward to going through this journey together with our membership and doing so with the utmost integrity.

Sincerely,

Murray S. Kessler

President

Read all the coverage of Kelley Farmer and Larry Glefke's suspensions in 2017, including each update, statements from them, responses from others and more.

Categories: Horse Show News

Tags: Drugs And Medication, Glefke & Farmer 2017 Suspensions, Kelley Farmer, Larry Glefke, Murray Kessler, USEF, USEF Hearings

3/28/2018            The Chronicle of the Horse



**WINTERTHUR RACE · SUNDAY, MAY 6**
SPRING RACING EVENT INFO · CALL 302.888.4602

## USEF CEO Bill Moroney Outlines Changes To USEF Drug Testing Procedures

By Edited Press Release
Feb 7, 2018 - 5:25 PM

Share

 

USEF CEO Bill Moroney expands on changes being made to the USEF Drugs & Medication Program and Laboratory. Photo by Mollie Bailey.

Since the U.S. Equestrian Federation announced it had revoked its affiliation with testing former test lab CEO Kenneth...alleged July 2015 GABA violation when arbitration revealed the laboratory made errors when handling the sample in that case, questions were raised about how the laboratory functioned.

On Feb. 1, USEF President Murray Kessler penned a letter to membership outlining steps being taken at all steps of the USEF Drugs & Medication process.

On Feb. 7, USEF CEO Bill Moroney released an additional letter that goes into more detail about changes made to all steps of the testing process.

Dear U.S. Equestrian Members,

As a follow up to the letter you received last week from U.S. Equestrian President Murray Kessler, I am writing to provide you with further detail regarding our actions and changes involving the USEF Drugs & Medication Program and Laboratory.

**Staffing Changes**

Effective last week, Laboratory Director Dr. Cornelius Uboh is no longer employed by the Federation. In addition, a laboratory technician has also left his position as well. The Federation will not immediately conduct a national search for a Laboratory Director. We have engaged outside consultants to work with us to map and implement our transition plans and accredited external equine testing laboratories have agreed to assist USEF to ensure that our program continues to operate uninterrupted.

**Program Audit/Assessment**

We have two independent consultants from the United Kingdom coming to the U.S. later this month to conduct a thorough assessment of the USEF Laboratory. The consultants will engage in a robust review of the laboratory processes, procedures, systems, equipment and training program and [will] provide a report to the Laboratory Strategic Assessment Task Force. We will update the membership no later than the Mid-Year Board of Directors meeting in June with a report from this task force.

**Staff Training**

We are developing and implementing an expanded training program for our laboratory employees. We will be participating in an exchange program whereby we send employees to other outstanding equine drug testing laboratories for supplemental training during their employment.

**Testing Personnel**

We are exploring opportunities to hire USEF testing veterinarians who would work exclusively for USEF. These teams would operate in addition to the veterinarian and USEF contracts to collect samples at competitions, and these testing teams would be deployed to test at designated competitions. As previously noted, our testing personnel will receive additional training on the new prepackaged Berringer horse testing kits which they will begin utilizing for sample collection at competitions. These new kits are supplied by the same company as testing kits utilized by the World Anti-Doping Agency.

**Member Resources**

We have updated and improved the USEF Drugs and Medication Guidelines and FAQ reference materials online. We will have printed brochures available at competitions going forward to help educate and inform members.

An FAQ and Guidelines are now available online.

**Integrity Program**

Please be reminded that last week we launched the USEF Integrity Program which provides our members with the opportunity to report issues in the field concerning testing as well as intelligence regarding conduct and practices that are contrary to the USEF rules and regulations. These reports should be directed to integrity@usef.org.

We appreciate your support during this period of transition for the USEF and our Drugs & Medication Program. We will continue to keep you updated on our work.

Best regards,

William J. Moroney

Chief Executive Officer

*Read all the coverage of Kelley Farmer and Larry Glefke's suspension in 2017, including each update, statements from them, responses from others and more.*

Categories: Horse Sports, News

Tags: 2015 scandal, Drugs And Medication, Kelly Farmer, 2017 Suspension, Kelley Farmer, Larry Glefke, USEF, USEF Hearings

NOT ORIGINAL DOCUMENT
02/04/2019 12:41:41 PM
cwright@mimfirm.com

| AOC-E-105     Sum Code: CI |  | Case #: **19-CI-00103** |
|---|---|---|
| Rev. 9-14 | | Court: **CIRCUIT** |
| Commonwealth of Kentucky Court of Justice   *Courts.ky.gov* | | County: **FAYETTE** |
| CR 4.02; Cr Official Form 1 | **CIVIL SUMMONS** | |

*Plantiff,* **UBOH, CORNELIUS VS. UNITED STATES EQUESTRIAN FEDERATION, ET,** *Defendant*

TO: **UNITED STATES EQUESTRIAN FEDERATION**

    **4047 IRON WORKS PARKWAY**

    **LEXINGTON, KY 40511**

Memo: Registered Agent of Service exists.

The Commonwealth of Kentucky to Defendant:

    You are hereby notified that a **legal action has been filed against you** in this Court demanding relief as shown on the document delivered to you with this Summons. **Unless a written defense is made by you or by an attorney on your behalf within twenty (20) days** following the day this paper is delivered to you, judgment by default may be taken against you for the relief demanded in the attached complaint.

The name(s) and address(es) of the party or parties demanding relief against you or his/her (their) attorney(s) are shown on the document delivered to you with this Summons.

*Vincent Riggs*

Fayette Circuit Clerk
Date: **1/11/2019**

---

## Proof of Service

This Summons was:

☐ Served by delivering a true copy and the Complaint (or other initiating document)

    To: _____

☐ Not Served because: _____

Date: _____, 20_____     _____

                                                     Served By

                                   _____

                                                     Title

Summons ID: @00000837250
CIRCUIT: 19-CI-00103 Certified Mail
UBOH, CORNELIUS VS. UNITED STATES EQUESTRIAN FEDERATION, ET

Page 1 of 1



NOT ORIGINAL DOCUMENT
02/04/2019 12:46:00 PM
cwright@mimfirm.com

| AOC-E-105     Sum Code: CI | | Case #: **19-CI-00103** |
| Rev. 9-14 |  | Court: **CIRCUIT** |
| Commonwealth of Kentucky | | County: **FAYETTE** |
| Court of Justice     *Courts.ky.gov* | | |
| CR 4.02; Cr Official Form 1 | **CIVIL SUMMONS** | |

*Plantiff,* **UBOH, CORNELIUS VS. UNITED STATES EQUESTRIAN FEDERATION, ET,** *Defendant*

TO:   **WILLIAM MORONEY**

      **4047 IRONWORKS PARKWAY**

      **LEXINGTON, KY 40511**

The Commonwealth of Kentucky to Defendant:

You are hereby notified that a **legal action has been filed against you** in this Court demanding relief as shown on the document delivered to you with this Summons. **Unless a written defense is made by you or by an attorney on your behalf within twenty (20) days** following the day this paper is delivered to you, judgment by default may be taken against you for the relief demanded in the attached complaint.

The name(s) and address(es) of the party or parties demanding relief against you or his/her (their) attorney(s) are shown on the document delivered to you with this Summons.

Fayette Circuit Clerk
Date: **1/11/2019**

---

## Proof of Service

This Summons was:

☐ Served by delivering a true copy and the Complaint (or other initiating document)

    To: _____

☐ Not Served because: _____

Date: _____, 20_____      _____
                                     Served By

                                           _____
                                           Title

Summons ID: @00000837251
CIRCUIT: 19-CI-00103 Return to Filer for Service
UBOH, CORNELIUS VS. UNITED STATES EQUESTRIAN FEDERATION, ET

Page 1 of 1

eFiled

NOT ORIGINAL DOCUMENT
02/04/2019 12:46:16 PM
cwright@mimfirm.com

AOC-E-105          Sum Code: CI
Rev. 9-14



Case #: **19-CI-00103**

Commonwealth of Kentucky
Court of Justice    *Courts.ky.gov*

Court:    **CIRCUIT**

CR 4.02; Cr Official Form 1

County: **FAYETTE**

# CIVIL SUMMONS

---

*Plantiff,* **UBOH, CORNELIUS VS. UNITED STATES EQUESTRIAN FEDERATION, ET,** *Defendant*


TO:  **MURRAY KESSLER**

   **4047 IRON WORKS PARKWAY**

   **LEXINGTON, KY 40511**


The Commonwealth of Kentucky to Defendant:


    You are hereby notified that a **legal action has been filed against you** in this Court demanding relief as shown on the document delivered to you with this Summons. **Unless a written defense is made by you or by an attorney on your behalf within twenty (20) days** following the day this paper is delivered to you, judgment by default may be taken against you for the relief demanded in the attached complaint.

The name(s) and address(es) of the party or parties demanding relief against you or his/her (their) attorney(s) are shown on the document delivered to you with this Summons.


*Vincent Riggs*

Fayette Circuit Clerk
Date: **1/11/2019**


---

## Proof of Service

This Summons was:

☐ Served by delivering a true copy and the Complaint (or other initiating document)

   To: _____

☐ Not Served because: _____

Date: _____, 20_____

_____
                                        Served By

_____
                                        Title

---

Summons ID: @00000837252
CIRCUIT: 19-CI-00103 Return to Filer for Service
UBOH, CORNELIUS VS. UNITED STATES EQUESTRIAN FEDERATION, ET



Page 1 of 1

NOT ORIGINAL DOCUMENT
02/04/2019 12:46:33 PM
cwright@mimfirm.com

| AOC-E-105    Sum Code: CI |  | Case #: 19-CI-00103 |
| Rev. 9-14 | | Court:  **CIRCUIT** |
| Commonwealth of Kentucky | | County: **FAYETTE** |
| Court of Justice    *Courts.ky.gov* | **CIVIL SUMMONS** | |
| CR 4.02; Cr Official Form 1 | | |

*Plaintiff*, **UBOH, CORNELIUS VS. UNITED STATES EQUESTRIAN FEDERATION, ET**, *Defendant*

TO:  **SONJA KEATING**

   **4047 IRON WORKS PARKWAY**

   **LEXINGTON, KY 40511**

The Commonwealth of Kentucky to Defendant:

   You are hereby notified that a **legal action has been filed against you** in this Court demanding relief as shown on the document delivered to you with this Summons. **Unless a written defense is made by you or by an attorney on your behalf within twenty (20) days** following the day this paper is delivered to you, judgment by default may be taken against you for the relief demanded in the attached complaint.

The name(s) and address(es) of the party or parties demanding relief against you or his/her (their) attorney(s) are shown on the document delivered to you with this Summons.

Fayette Circuit Clerk
Date: **1/11/2019**

## Proof of Service

This Summons was:

☐ Served by delivering a true copy and the Complaint (or other initiating document)

   To: _____

☐ Not Served because: _____

Date: _____, 20_____        _____
                                                    Served By

                                           _____
                                                    Title

Summons ID: @00000837253
CIRCUIT: 19-CI-00103 Return to Filer for Service
UBOH, CORNELIUS VS. UNITED STATES EQUESTRIAN FEDERATION, ET

eFiled

Page 1 of 1



AOC-E-105    Sum Code: CI
Rev. 9-14

Commonwealth of Kentucky
Court of Justice    Courts.ky.gov

CR 4.02; Cr Official Form 1

**CIVIL SUMMONS**

NOT ORIGINAL DOCUMENT
02/04/2019 12:46:44 PM
cwright@mimfirm.com

Case #: **19-CI-00103**
Court: **CIRCUIT**
County: **FAYETTE**

*Plantiff,* **UBOH, CORNELIUS VS. UNITED STATES EQUESTRIAN FEDERATION, ET,** *Defendant*

TO:  **KENT ALLEN**

    **4047 IRON WORKS PARKWAY**

    **LEXINGTON, KY 40511**

The Commonwealth of Kentucky to Defendant:

    You are hereby notified that a **legal action has been filed against you** in this Court demanding relief as shown on the document delivered to you with this Summons. **Unless a written defense is made by you or by an attorney on your behalf within twenty (20) days** following the day this paper is delivered to you, judgment by default may be taken against you for the relief demanded in the attached complaint.

The name(s) and address(es) of the party or parties demanding relief against you or his/her (their) attorney(s) are shown on the document delivered to you with this Summons.

           *Vincent Riggs*

           Fayette Circuit Clerk
           Date: **1/11/2019**

---

## Proof of Service

This Summons was:

☐ Served by delivering a true copy and the Complaint (or other initiating document)

    To: _____

☐ Not Served because: _____

Date: _____, 20_____

                   _____
                         Served By

                   _____
                         Title

Summons ID: @00000837254
CIRCUIT: 19-CI-00103 Return to Filer for Service
UBOH, CORNELIUS VS. UNITED STATES EQUESTRIAN FEDERATION, ET







NOT ORIGINAL DOCUMENT
02/04/2019 12:46:54 PM
cwright@mimfirm.com

| AOC-E-105    Sum Code: CI | | Case #: **19-CI-00103** |
| --- | --- | --- |
| Rev. 9-14 | | |
| | | Court: **CIRCUIT** |
| Commonwealth of Kentucky | | |
| Court of Justice    *Courts.ky.gov* | | County: **FAYETTE** |
| CR 4.02; Cr Official Form 1 | **CIVIL SUMMONS** | |

*Plantiff,* **UBOH, CORNELIUS VS. UNITED STATES EQUESTRIAN FEDERATION, ET**, *Defendant*

TO:  **SONJA KEATING**

**UNITED STATES EQUESTRIAN FEDERATION**

**4047 IRON WORKS PARKWAY**

**LEXINGTON, KY 40511**

Memo: Related party is UNITED STATES EQUESTRIAN FEDERATION

The Commonwealth of Kentucky to Defendant:
**UNITED STATES EQUESTRIAN FEDERATION**

You are hereby notified that a **legal action has been filed against you** in this Court demanding relief as shown on the document delivered to you with this Summons. **Unless a written defense is made by you or by an attorney on your behalf within twenty (20) days** following the day this paper is delivered to you, judgment by default may be taken against you for the relief demanded in the attached complaint.

The name(s) and address(es) of the party or parties demanding relief against you or his/her (their) attorney(s) are shown on the document delivered to you with this Summons.

Fayette Circuit Clerk
Date: **1/11/2019**

## Proof of Service

This Summons was:

☐ Served by delivering a true copy and the Complaint (or other initiating document)

To: _____

☐ Not Served because: _____

Date: _____, 20 _____

_____
Served By

_____
Title




eFiled

NOT ORIGINAL DOCUMENT
02/04/2019 12:47:26 PM
cwright@mimfirm.com



**Commonwealth of Kentucky**
**Vincent Riggs, Fayette Circuit Clerk**

Case #: 19-CI-00103               Envelope #: 1407426

Received From: JOHN ABARAY               Account Of: JOHN ABARAY

Case Title: UBOH, CORNELIUS VS. UNITED STATES
EQUESTRIAN FEDERATION, ET               Confirmation Number: 86580271
Filed On: 1/11/2019  2:45:56PM

| # | Item Description | Amount |
|---|---|---|
| 1 | Access To Justice Fee | $20.00 |
| 2 | Civil Filing Fee | $150.00 |
| 3 | Money Collected For Others(Court Tech. Fee) | $20.00 |
| 4 | Library Fee | $1.00 |
| 5 | Court Facilities Fee | $25.00 |
| 6 | Money Collected For Others(Attorney Tax Fee) | $5.00 |
| 7 | Charges For Services(Jury Demand / 12) | $70.00 |
| 8 | Money Collected For Others(Postage) | $13.66 |
| 9 | Charges For Services(Copy - Photocopy) | $4.60 |
| | **TOTAL:** | $309.26 |